UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| KEVIN BERRY, DARREN BARSNESS, CHRISTOPHER BESTOR, RON CROWLEY, ROGER W. DUNAGAN, DARYLE CRAIG EAGLE, JOHN FISHER, JARED GEUDER, BLAKE GRESSETT, TANNER GRIFFIN, RICHARD TERRELL HAYDOCK, ROBERT HEARNE, CHARLES DALE HOYT, CEDRIC JONES, JACK LANDRY MANN, MICHAEL MATHEWS, SHANE MCCASLIN, OROZCO, JIMMY JOSE ORTIZ, CHRISTOPHER LEE PERRY, TODD ROBINSON, RAY ANTHONY RODRIGUEZ, SARA ROOK, JOSHUA SCHATZEL, JOSEPH ANTHONY STALLONE, CHARLEY TANNER, DAVID WALKER, RUDY ZEPEDA, ALDO GRANILLO, MICHAEL JEFFCOAT, each plaintiff is a citizen of the State of Texas, and each plaintiff individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT BOSCH GMBH, a corporation organized and existing under the laws of the Federal Republic of Germany; ROBERT BOSCH, LLC, a Delaware corporation; GENERAL MOTORS LLC, a Delaware corporation; FORD MOTOR COMPANY, a Delaware corporation FCA US LLC, F/K/A CHRYSLER GROUP, a Delaware corporation; VM ITALY, an Italian corporation; and VM NORTH AMERICA, a Delaware corporation.<br><br>Defendants, | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Cause No. 2:18-cv-00318<br><br><br>CLASS ACTION<br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Christopher Bestor, Ron Crowley, Christopher Lee Perry, Todd Robinson, Joshua Schatzel, Rudy Zepeda, each individually and on behalf of all others similarly situated in the RICO Class and on behalf of all others similarly situated in the GM Subclass; Plaintiffs Darren Barsness, Roger W. Dunagan, Daryle Craig Eagle, John Fisher, Jared Geuder, Blake Gressett, Tanner Griffin, Richard Terrell Haydock, Robert Hearne, Charles Dale Hoyt, Cedric Jones, Jack Landry Mann, Michael Mathews, Shane McCaslin, Jimmy Orozco, Jose Ortiz, Ray Anthony Rodriguez, Sara Rook, Joseph Anthony Stallone, Charley Tanner, David Walker, Aldo Granillo, and Michael Jeffcoat, each individually and on behalf of all others similarly situated in the RICO Class and on behalf of all others similarly situated in the Ford Subclass; and Plaintiff Kevin Berry, individually and on behalf of all others similarly situated in the RICO Class and on behalf of all others similarly situated in the FCA Subclass[1], file this suit against Defendants Robert Bosch GMBH; Robert Bosch, LLC[2], General Motors LLC; Ford Motor Company, FCA US LLC, F/K/A Chrysler Group[3]; VM Italy and VM North America[4]. In support thereof, Plaintiffs state as follows:

## I.      INTRODUCTION

1.      The Vehicle Manufacturer Defendants saw Bosch's CP4 fuel injection pump as another way to make money—to take advantage of consumers' desire to drive diesel vehicles that were reliable, durable, fuel-efficient, and powerful. After the CP4 fuel injection system worked

---

[1] The GM Subclass, Ford Subclass, and FCA Subclass are collectively referred to as the "Vehicle Manufacturer Subclasses." The "Vehicle Manufacturer Subclasses" together with the "RICO Class" is the "Class."

[2] Robert Bosch GMBH and Robert Bosch, LLC are collectively referred to as "Bosch."

[3] Defendants General Motors LLC; Ford Motor Company, and FCA US LLC, F/K/A Chrysler Group are collectively referred to as the "Vehicle Manufacturer Defendants."

[4] VM Italy and VM North American are collectively referred to as "VM Motori." Bosch, the Vehicle Manufacturer Defendants and VM Motori are collectively referred to as "Defendants."

successfully in vehicles in Europe, Defendants General Motors (designing, manufacturing and selling vehicles under the GM brands Chevrolet and GMC), Ford, and FCA (designing, manufacturing, marketing and selling vehicles under the FCA brands Jeep, Dodge, Fiat and Chrysler), together with Bosch and VM Motori, sought to use the CP4 system in American vehicles, promising consumers exactly what they were looking for—improvements in torque, horsepower, durability, and fuel economy. But Defendants couldn't deliver that promise for American vehicles because the CP4 fuel pump is not compatible with American diesel fuel.

2.      Unbeknownst to consumers, the improved fuel efficiency of the Bosch CP4 Pump in American vehicles comes at the cost of running the pump nearly dry so that it destroys itself, and ultimately and catastrophically, destroys the fuel injection system and the engine. American diesel fuel is cleaner, which means that it also provides less lubrication than European diesel fuel. The lubricity specifications of American diesel are incompatible with the specifications of the CP4 system. When American diesel fuel is run through the fast moving, high pressure, lower volume CP4 pump, it struggles to maintain lubrication. The cleaner, thinner diesel allows air pockets to form inside the pump during operation, causing metal to rub against metal, ultimately generating metal shavings which are dispersed throughout, contaminate and destroy the fuel system. Contrary to Defendants' claims that the CP4 fuel injection system is more reliable, more durable, more powerful, and more fuel-efficient, the CP4 fuel injection system is costly and destructive. The Bosch CP4 Pump often fails when a vehicle nears 100,000 miles, and requires repair or replacement of the entire high-pressure fuel system, costing consumers, on average, between $8,000.000 and $15,000.000.

3.      The rub is that Defendants knew, from the specifications of the pump as compared to the specifications of American diesel, that the Bosch CP4 Pump was not compatible with

American diesel fuel before they ever chose to incorporate it in American vehicles. Defendants had experience with widespread catastrophic fuel injection pump failures when cleaner diesel standards were first implemented in the 1990s. By 2002, the Vehicle Manufacturer Defendants, through the Engine Manufacturers Association, acknowledged the lower lubricity of American diesel could cause catastrophic failure in fuel injection system components that are made to European diesel specifications. Not only did the Defendants fail to inform American consumers and fail to stop touting the fabricated benefits of the vehicles containing CP4 pumps, they actively attempted to shift the blame to the American consumers. For instance, in 2010, Ford claimed it was consumers' improper use of contaminated or substandard fuels that damaged the fuel system, even when Ford knew the fuel injection systems' poor performance was not the consumers' fault but the result of the CP4 fuel injection pump that was simply not fit for American diesel fuel.

4.      Engines with Bosch CP4 fuel injection pumps[5] are not compatible with American fuel, and Defendants' conduct is not compatible with American law. Defendants knowingly and intentionally deceived American consumers both through their individual representations to their respective consumers and in concert with one another in furtherance of an unlawful scheme to increase revenues and profits at the expense of consumers.

5.      These consumers are entitled to be reimbursed for the billions of dollars Defendants fraudulently obtained from these consumers, and to be compensated for the actual or expected losses that have or will inevitably occur when their vehicles' fuel pumps fail. This lawsuit seeks to hold Defendants accountable to these consumers, who are the unwitting casualties of Defendants' massive fraud.

## II.      PARTIES

---

[5] Throughout this Complaint, "Class Vehicle" is defined as any vehicle fitted with (or fitted with at the point of sale) a Bosch CP4 fuel pump.

### A. The Plaintiffs

6.　　For ease of reference, the following chart identifies the Representative Plaintiffs and their vehicles:

| Representative Plaintiff | Brand | Make | Model | Year |
|---|---|---|---|---|
| Barsness, Darren | Ford | Ford | F250 | 2014 |
| Berry, Kevin | FCA | Jeep | Grand Cherokee 4x4 Summit 3.0 Diesel | 2014 |
| Bestor, Christopher | GM | Chevrolet | Silverado | 2014 |
| Crowley, Ron | GM | GMC | 3500 Sierra | |
| Dunagan, Roger W. | Ford | Ford | Ford F350 | 2012 |
| Eagle, Daryle Craig | Ford | Ford | F450 | 2016 |
| Fisher, John | Ford | Ford | F 250 | 2015 |
| Geuder, Jared | Ford | Ford | F-250 King Ranch edition | 2011 |
| Gressett, Blake | Ford | Ford | F350 | 2013 |
| Griffin, Tanner | Ford | Ford | F250 | 2011 |
| Haydock, Richard Terrell | Ford | Ford | F 250 | 2011 |
| Hearne, Robert | Ford | Ford | F350 | |
| Hoyt, Charles Dale | Ford | Ford | F250 | 2012 |
| Jones, Cedric | Ford | Ford | F250 | 2016 |
| Mann, Jack Landry | Ford | Ford | F250 Super Duty Laria Fx4 | 2013 |
| Mathews, Michael | Ford | Ford | F 250 | 2011 |
| McCaslin, Shane | Ford | Ford | F250 | 2011 |
| Orozco, Jimmy | Ford | Ford | F350 | 2016 |
| Ortiz, Jose | Ford | Ford | F 250 | 2013 |
| Perry, Christopher Lee | GM | Chevrolet | 3500 | 2012 |
| Robinson, Todd | GM | Chevrolet | 3500 | 2015 |
| Rodriguez, Ray Anthony | Ford | Ford | F250 | 2012 |
| Rook, Sara | Ford | Ford | F250 | 2013 |
| Schatzel, Joshua | GM | Chevy | Silverado | 2016 |
| Stallone, Joseph Anthony | Ford | Ford | F350 | 2012 |

| | | | | |
|---|---|---|---|---|
| Tanner, Charley | Ford | Ford | F-450 | 2012 |
| Walker, David | Ford | Ford | F250 | 2015 |
| Zepeda, Rudy | GM | GMC | Denali | 2011 |
| Granillo, Aldo | Ford | Ford | F-350 | 2011 |
| Jeffcoat, Michael | Ford | Ford | F-250 Super Duty | 2011 |

7.     Plaintiff Christopher Bestor (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Caldwell, Texas.  On or around August of 2013, Plaintiff purchased a 2014 Chevrolet Silverado, VIN 1GC1KXC85EF117182 (for the purpose of this paragraph, the "Class Vehicle") from Caldwell Country Chevrolet, in Caldwell, Texas.  Prior to purchasing the Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Although Plaintiff was considering other vehicles, Plaintiff settled on the vehicle because Plaintiff relied upon GM's claims touting the vehicle's durability, efficiency, fuel economy, power and performance of the engine.  These representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers.  Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon.  Plaintiff and each GM Subclass Member has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle and would have paid less for it, had Defendants not concealed the CP4 fuel injection

system defects. Plaintiff's and each GM Subclass Member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs if modified to address durability, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff brings his claims individually and as a representative of the RICO Class and the GM Subclass.

8. Plaintiff Christopher Lee Perry (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Temple, Texas. On or around October of 2017, Plaintiff purchased a 2012 Chevrolet 3500, VIN 1GC4K0C86CF145784 (for the purpose of this paragraph, the "Class Vehicle") from Texas Diesel Store in Killeen, Texas. Prior to purchasing the Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Although Plaintiff was considering other vehicles, Plaintiff settled on the vehicle because Plaintiff relied upon GM's claims touting the vehicle's durability, efficiency, fuel economy, power and performance of the engine. These representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Plaintiff and each GM Subclass Member has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class

Vehicle and would have paid less for it, had Defendants not concealed the CP4 fuel injection system defects. Plaintiff's and each GM Subclass Member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff brings his claims individually and as a representative of the RICO Class and the GM Subclass.

9.      Plaintiff Joshua Schatzel (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Grandbury, Texas.  On or around April of 2017, Plaintiff purchased a 2016 Chevrolet Silverado, VIN 1DC1KDE8XTF166995 (for the purpose of this paragraph, the "Class Vehicle") from All American Chevrolet in Odessa, Texas.  Prior to purchasing the Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Although Plaintiff was considering other vehicles, Plaintiff settled on the vehicle because Plaintiff relied upon GM's claims touting the vehicle's durability, efficiency, fuel economy, power and performance of the engine.  These representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers.  Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon.  Plaintiff and each GM Subclass Member has suffered concrete injury as a

direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle and would have paid less for it, had Defendants not concealed the CP4 fuel injection system defects. Plaintiff's and each GM Subclass Member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff brings his claims individually and as a representative of the RICO Class and the GM Subclass.

10.     Plaintiff Ron Crowley (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Fritch, Texas.  On or around November of 2014, Plaintiff purchased a 2015 GMC 3500 Sierra, VIN 1GT424E83FF542992 (for the purpose of this paragraph, the "Class Vehicle") from Country Chevrolet in Borger, Texas.  Prior to purchasing the Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Although Plaintiff was considering other vehicles, Plaintiff settled on the vehicle because Plaintiff relied upon GMC's claims touting the vehicle's durability, efficiency, fuel economy, power and performance of the engine.  These representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers.  Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon.

Plaintiff and each GM Subclass Member has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle and would have paid less for it, had Defendants not concealed the CP4 fuel injection system defects. Plaintiff's and each GM Subclass Member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff brings his claims individually and as a representative of the RICO Class and the GM Subclass.

11.     Plaintiff Rudy Zepeda (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Iola, Texas.  On or around July of 2017, Plaintiff purchased a 2011 GMC Denali, VIN 1GT125C8XBF243618 (for the purpose of this paragraph, the "Class Vehicle") from Sterling Auto Group in College Station, Texas.  Prior to purchasing the Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Although Plaintiff was considering other vehicles, Plaintiff settled on the vehicle because Plaintiff relied upon GM's claims touting the vehicle's durability, efficiency, fuel economy, power and performance of the engine.  These representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers.  Consequently, the vehicle could not deliver the advertised

combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Plaintiff and each GM Subclass Member has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle and would have paid less for it, had Defendants not concealed the CP4 fuel injection system defects. Plaintiff's and each GM Subclass Member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff brings his claims individually and as a representative of the RICO Class and the GM Subclass.

12.     Plaintiff Ethan Galan (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Hereford, Texas.  On or around August of 2017, Plaintiff purchased a 2015 GMC 2500 Sierra SLT, VIN 1GT12ZE80FF600590 (for the purpose of this paragraph, the "Class Vehicle") from McGabock Nissan in Amarillo, Texas.  Prior to purchasing the Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Although Plaintiff was considering other vehicles, Plaintiff settled on the vehicle because Plaintiff relied upon GM's claims touting the vehicle's durability, efficiency, fuel economy, power and performance of the engine.  These representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American

vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Plaintiff and each GM Subclass Member has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle and would have paid less for it, had Defendants not concealed the CP4 fuel injection system defects. Plaintiff's and each GM Subclass Member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff brings his claims individually and as a representative of the RICO Class and the GM Subclass.

13.     Plaintiff Todd Robinson (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Corpus Christi, Nueces County, Texas. Plaintiff purchased a 2015 Chevrolet Silverado 3500, VIN 1GC4K1E80FF6290543 (for the purpose of this paragraph, the "Class Vehicle") from Escamilla Ford in San Antonio, Texas. Prior to purchasing the Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Although Plaintiff was considering other vehicles, Plaintiff settled on the vehicle because Plaintiff relied upon GM's claims touting the vehicle's durability, efficiency, fuel economy, power and performance of the engine. These representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a

defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Plaintiff and each GM Subclass Member has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle and would have paid less for it, had Defendants not concealed the CP4 fuel injection system defects. Plaintiff's and each GM Subclass Member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff brings his claims individually and as a representative of the RICO Class and the GM Subclass.

14.     Plaintiff Darren Barsness (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Schertz, Texas.  On or around August of 2013, Plaintiff purchased a 2014 Ford F250, VIN 1FT7W2BT2EEA0829 (for the purpose of this paragraph, the "Class Vehicle") from Jordan Ford in San Antonio, Texas.  Prior to purchasing the Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Although Plaintiff was considering other vehicles, Plaintiff settled on the vehicle because Plaintiff relied upon Ford's claims touting the vehicle's durability, efficiency, fuel economy, power and performance of the engine.  These representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the

Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Plaintiff and each Ford Subclass Member has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle and would have paid less for it, had Defendants not concealed the CP4 fuel injection system defects. Plaintiff's and each Ford Subclass Member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff brings his claims individually and as a representative of the RICO Class and the Ford Subclass.

15.     Plaintiff Roger W. Dunagan (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Kerrville, Texas. On or around February of 2012, Plaintiff purchased a 2012 Ford Ford F350, VIN 1FT8W3BT9CEC09271 (for the purpose of this paragraph, the "Class Vehicle") from Ken Stoepel Ford in Kerrville, Texas. Prior to purchasing the Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Although Plaintiff was considering other vehicles, Plaintiff settled on the vehicle because Plaintiff relied upon Ford's claims touting the vehicle's durability, efficiency, fuel economy, power and performance of the engine. These representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance

throughout its useful life, and the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers.  Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon.  Plaintiff and each Ford Subclass Member has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle and would have paid less for it, had Defendants not concealed the CP4 fuel injection system defects. Plaintiff's and each Ford Subclass Member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff brings his claims individually and as a representative of the RICO Class and the Ford Subclass.

16. Plaintiff Daryle Craig Eagle (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Rowlett, Texas.  On or around October of 2015, Plaintiff purchased a 2016 Ford F450, VIN 1FT8W4DT1GEA89894 (for the purpose of this paragraph, the "Class Vehicle") from Prestige Ford in Garland, Texas.  Prior to purchasing the Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Although Plaintiff was considering other vehicles, Plaintiff settled on the vehicle because Plaintiff relied upon Ford's claims touting the vehicle's durability, efficiency, fuel economy, power and performance of the engine.  These representations, in combination with the advertised fuel efficiency and performance, the representation that the

vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Plaintiff and each Ford Subclass Member has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle and would have paid less for it, had Defendants not concealed the CP4 fuel injection system defects. Plaintiff's and each Ford Subclass Member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff brings his claims individually and as a representative of the RICO Class and the Ford Subclass.

17.    Plaintiff John Fisher (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in McKinney, Texas. On or around February of 2017, Plaintiff purchased a 2015 Ford F 250, VIN 1FT7W2BT6FEC10209 (for the purpose of this paragraph, the "Class Vehicle") from Dodge City of McKinney in McKinney Texas. Prior to purchasing the Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Although Plaintiff was considering other vehicles, Plaintiff settled on the vehicle because Plaintiff relied upon Ford's claims touting the vehicle's durability, efficiency, fuel economy, power and performance of the engine. These representations,

in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Plaintiff and each Ford Subclass Member has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle and would have paid less for it, had Defendants not concealed the CP4 fuel injection system defects. Plaintiff's and each Ford Subclass Member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff brings his claims individually and as a representative of the RICO Class and the Ford Subclass.

18.     Plaintiff Jared Geuder (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Burlington, Texas. On or around January of 2017, Plaintiff purchased a 2011 Ford F-250 King Ranch edition, VIN 1FT7W2BT7BEBO8962 (for the purpose of this paragraph, the "Class Vehicle") from Johnson Brother Ford in Temple, Texas. Prior to purchasing the Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Although Plaintiff was considering other vehicles, Plaintiff settled on the vehicle because Plaintiff relied upon Ford's claims touting

the vehicle's durability, efficiency, fuel economy, power and performance of the engine. These representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Plaintiff and each Ford Subclass Member has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle and would have paid less for it, had Defendants not concealed the CP4 fuel injection system defects. Plaintiff's and each Ford Subclass Member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff brings his claims individually and as a representative of the RICO Class and the Ford Subclass.

19.    Plaintiff Aldo Granillo (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Seagraves, Texas. Prior to 2011, Plaintiff purchased a 2011 Ford F-350, VIN 1FT8W3DT3BEA76163 (for the purpose of this paragraph, the "Class Vehicle") from Hamilton Big country Ford in Clovis, New Mexico. Prior to purchasing the Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Although Plaintiff was considering other vehicles, Plaintiff

settled on the vehicle because Plaintiff relied upon Ford's claims touting the vehicle's durability, efficiency, fuel economy, power and performance of the engine. These representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Plaintiff and each Ford Subclass Member has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle and would have paid less for it, had Defendants not concealed the CP4 fuel injection system defects. Plaintiff's and each Ford Subclass Member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff brings his claims individually and as a representative of the RICO Class and the Ford Subclass.

20. Plaintiff Tanner Griffin (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Simms, Texas. On or around October of 017, Plaintiff purchased a 2011 Ford F250, VIN 1FT7W2BT2BEA05528 (for the purpose of this paragraph, the "Class Vehicle") from Robbins Toyota of Texarkana in Texarkana, Texas. Prior to purchasing the Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain

the high mileage per gallon of a diesel vehicle. Although Plaintiff was considering other vehicles, Plaintiff settled on the vehicle because Plaintiff relied upon Ford's claims touting the vehicle's durability, efficiency, fuel economy, power and performance of the engine. These representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Plaintiff and each Ford Subclass Member has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle and would have paid less for it, had Defendants not concealed the CP4 fuel injection system defects. Plaintiff's and each Ford Subclass Member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff brings his claims individually and as a representative of the RICO Class and the Ford Subclass.

21.     Plaintiff Richard Terrell Haydock (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in League City, Texas. On or around July of 2011, Plaintiff purchased a 2011 Ford F 250, VIN 1FT7W2BT0BEA04684 (for the purpose of this paragraph, the "Class Vehicle") from Ron Carter & Alvin in Alvin, Texas. Prior to purchasing the

Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Although Plaintiff was considering other vehicles, Plaintiff settled on the vehicle because Plaintiff relied upon Ford's claims touting the vehicle's durability, efficiency, fuel economy, power and performance of the engine. These representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Plaintiff and each Ford Subclass Member has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle and would have paid less for it, had Defendants not concealed the CP4 fuel injection system defects. Plaintiff's and each Ford Subclass Member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff brings his claims individually and as a representative of the RICO Class and the Ford Subclass.

22. Plaintiff Robert Hearne (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Spottford, Texas. On or around January of 2015, Plaintiff purchased a 2014 Ford F350, VIN 1FT8W3BT3EEB41097 (for the purpose of this paragraph, the

"Class Vehicle") from Cecil Atkission Ford Lincoln in Del Rio, Texas. Prior to purchasing the Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Although Plaintiff was considering other vehicles, Plaintiff settled on the vehicle because Plaintiff relied upon Ford's claims touting the vehicle's durability, efficiency, fuel economy, power and performance of the engine. These representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Plaintiff and each Ford Subclass Member has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle and would have paid less for it, had Defendants not concealed the CP4 fuel injection system defects. Plaintiff's and each Ford Subclass Member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff brings his claims individually and as a representative of the RICO Class and the Ford Subclass.

23. Plaintiff Charles Dale Hoyt (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Groves, Texas. On or around August of 2013,

Plaintiff purchased a 2012 Ford F250, VIN 1FT7W2BT6CEA97227 (for the purpose of this paragraph, the "Class Vehicle") from Philpott Ford in Nederland, Texas. Prior to purchasing the Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Although Plaintiff was considering other vehicles, Plaintiff settled on the vehicle because Plaintiff relied upon Ford's claims touting the vehicle's durability, efficiency, fuel economy, power and performance of the engine. These representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Plaintiff and each Ford Subclass Member has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle and would have paid less for it, had Defendants not concealed the CP4 fuel injection system defects. Plaintiff's and each Ford Subclass Member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff brings his claims individually and as a representative of the RICO Class and the Ford Subclass.

24.     Plaintiff Michael Jeffcoat (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Warren, Texas. On or around May of 2015, Plaintiff purchased a 2011 Ford F-250 Super Duty, VIN 1FT7W2BTXBED02563 (for the purpose of this paragraph, the "Class Vehicle") from Silsbee Auto in Silsbee, Texas. Prior to purchasing the Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Although Plaintiff was considering other vehicles, Plaintiff settled on the vehicle because Plaintiff relied upon Ford's claims touting the vehicle's durability, efficiency, fuel economy, power and performance of the engine. These representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Plaintiff and each Ford Subclass Member has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle and would have paid less for it, had Defendants not concealed the CP4 fuel injection system defects. Plaintiff's and each Ford Subclass Member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles.

Plaintiff brings his claims individually and as a representative of the RICO Class and the Ford Subclass.

25. Plaintiff Cedric Jones (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Tyler, Texas. On or around August of 2016, Plaintiff purchased a 2016 Ford F250, VIN 1FT7W2BT9GED23508 (for the purpose of this paragraph, the "Class Vehicle") from John Bower Ford in Rockwall, Texas. Prior to purchasing the Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Although Plaintiff was considering other vehicles, Plaintiff settled on the vehicle because Plaintiff relied upon Ford's claims touting the vehicle's durability, efficiency, fuel economy, power and performance of the engine. These representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Plaintiff and each Ford Subclass Member has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle and would have paid less for it, had Defendants not concealed the CP4 fuel injection system defects. Plaintiff's and each Ford Subclass Member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future

additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff brings his claims individually and as a representative of the RICO Class and the Ford Subclass.

26.     Plaintiff Jack Landry Mann (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in League City, Texas. On or around March of 2013, Plaintiff purchased a 2013 Ford F250 Super Duty Lariat Fx4, VIN 1FT7W2BT5DEA84521 (for the purpose of this paragraph, the "Class Vehicle") from McCree Ford in Dickinson, Texas. Prior to purchasing the Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Although Plaintiff was considering other vehicles, Plaintiff settled on the vehicle because Plaintiff relied upon Ford's claims touting the vehicle's durability, efficiency, fuel economy, power and performance of the engine. These representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Plaintiff and each Ford Subclass Member has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle and would have paid less for it, had Defendants not concealed the CP4 fuel injection system defects. Plaintiff's and each Ford Subclass Member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-

powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff brings his claims individually and as a representative of the RICO Class and the Ford Subclass.

27.     Plaintiff Michael Mathews (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Lagrange, Texas.  On or around November of 2013, Plaintiff purchased a 2011 Ford F 250, VIN 1FT7W2BT3BEA16537 (for the purpose of this paragraph, the "Class Vehicle") from Lagrange Ford in Lagrange, Texas.  Prior to purchasing the Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Although Plaintiff was considering other vehicles, Plaintiff settled on the vehicle because Plaintiff relied upon Ford's claims touting the vehicle's durability, efficiency, fuel economy, power and performance of the engine.  These representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers.  Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Plaintiff and each Ford Subclass Member has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle and would have paid less for it, had Defendants not concealed the CP4 fuel injection system defects. Plaintiff's and each Ford Subclass Member's ascertainable losses include, but are not limited to, a high premium

for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff brings his claims individually and as a representative of the RICO Class and the Ford Subclass.

28.     Plaintiff Shane McCaslin (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Corsicana, Texas. Prior to 2011, Plaintiff purchased a 2011 Ford F250, VIN 1FT7X2BT8BEB79956 (for the purpose of this paragraph, the "Class Vehicle") from Wallen's Autos in Corsicana, Texas. Prior to purchasing the Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Although Plaintiff was considering other vehicles, Plaintiff settled on the vehicle because Plaintiff relied upon Ford's claims touting the vehicle's durability, efficiency, fuel economy, power and performance of the engine. These representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Plaintiff and each Ford Subclass Member has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle and would have paid less for it, had Defendants not concealed the CP4 fuel injection system defects. Plaintiff's and each Ford Subclass Member's

ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff brings his claims individually and as a representative of the RICO Class and the Ford Subclass.

29.     Plaintiff Jose Ortiz (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Palacios, Texas.  On or around January of 2015, Plaintiff purchased a 2013 Ford F 250,  (for the purpose of this paragraph, the "Class Vehicle") from Direct Auto in Houston, Texas.  Prior to purchasing the Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Although Plaintiff was considering other vehicles, Plaintiff settled on the vehicle because Plaintiff relied upon Ford's claims touting the vehicle's durability, efficiency, fuel economy, power and performance of the engine.  These representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers.  Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon.  Plaintiff and each Ford Subclass Member has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle and would have paid less for it, had Defendants not concealed the CP4 fuel injection system defects. Plaintiff's and each Ford Subclass Member's ascertainable

losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff brings his claims individually and as a representative of the RICO Class and the Ford Subclass.

30.     Plaintiff Ray Anthony Rodriguez (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Poteet, Texas.  On or around April of 2015, Plaintiff purchased a 2012 Ford F250, VIN 1FT7W2BT2CEB32670 (for the purpose of this paragraph, the "Class Vehicle") from Swans Autosales in Pleasanton, Texas.  Prior to purchasing the Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Although Plaintiff was considering other vehicles, Plaintiff settled on the vehicle because Plaintiff relied upon Ford's claims touting the vehicle's durability, efficiency, fuel economy, power and performance of the engine.  These representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers.  Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon.  Plaintiff and each Ford Subclass Member has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle and would have paid less for it, had Defendants not concealed the CP4 fuel injection

system defects. Plaintiff's and each Ford Subclass Member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff brings his claims individually and as a representative of the RICO Class and the Ford Subclass.

31.     Plaintiff Sara Rook (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Dayton, Texas.  On or around July of 2005, Plaintiff purchased a 2013 Ford F250, VIN 1FT7W2BT7DEB6904 (for the purpose of this paragraph, the "Class Vehicle") from Billy Navarre Chevrolet in Lake Charles, LA.  Prior to purchasing the Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Although Plaintiff was considering other vehicles, Plaintiff settled on the vehicle because Plaintiff relied upon Ford's claims touting the vehicle's durability, efficiency, fuel economy, power and performance of the engine.  These representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers.  Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Plaintiff and each Ford Subclass Member has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle and would have

paid less for it, had Defendants not concealed the CP4 fuel injection system defects. Plaintiff's and each Ford Subclass Member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff brings her claims individually and as a representative of the RICO Class and the Ford Subclass.

32.     Plaintiff Charley Tanner (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Arp, Texas.  On or around July of 2005, Plaintiff purchased a 2012 Ford F-450, VIN 1FDUF4HTXCEC12400 (for the purpose of this paragraph, the "Class Vehicle") from Southwest Ford in Weatherford, Texas.  Prior to purchasing the Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Although Plaintiff was considering other vehicles, Plaintiff settled on the vehicle because Plaintiff relied upon Ford's claims touting the vehicle's durability, efficiency, fuel economy, power and performance of the engine.  These representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers.  Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Plaintiff and each Ford Subclass Member has suffered concrete injury as a direct and proximate

result of Defendants' conduct, and would not have purchased the Class Vehicle and would have paid less for it, had Defendants not concealed the CP4 fuel injection system defects. Plaintiff's and each Ford Subclass Member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff brings his claims individually and as a representative of the RICO Class and the Ford Subclass.

33. Plaintiff David Walker (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Fort Worth, Texas. On or around June of 2018, Plaintiff purchased a 2015 Ford F250, VIN 1FT7W2BT7FEC53179 (for the purpose of this paragraph, the "Class Vehicle") from Classic Chevrolet in Grapevine, Texas. Prior to purchasing the Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Although Plaintiff was considering other vehicles, Plaintiff settled on the vehicle because Plaintiff relied upon Ford's claims touting the vehicle's durability, efficiency, fuel economy, power and performance of the engine. These representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon.

Plaintiff and each Ford Subclass Member has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle and would have paid less for it, had Defendants not concealed the CP4 fuel injection system defects. Plaintiff's and each Ford Subclass Member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff brings his claims individually and as a representative of the RICO Class and the Ford Subclass.

34.     Plaintiff Richard Douglas Blackwell (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Montgomery, Texas.  On or around May of 2017, Plaintiff purchased a 2012 Ford F250, VIN 1FP7W2BTXCEB57686 (for the purpose of this paragraph, the "Class Vehicle") from Beck and Mapen in Tomball, Texas.  Prior to purchasing the Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Although Plaintiff was considering other vehicles, Plaintiff settled on the vehicle because Plaintiff relied upon Ford's claims touting the vehicle's durability, efficiency, fuel economy, power and performance of the engine.  These representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers.  Consequently, the vehicle could not deliver the advertised

combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Plaintiff and each Ford Subclass Member has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle and would have paid less for it, had Defendants not concealed the CP4 fuel injection system defects. Plaintiff's and each Ford Subclass Member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff brings his claims individually and as a representative of the RICO Class and the Ford Subclass.

35.     Plaintiff Harold Laney (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Gilmer, Texas.  On or around November of 2017, Plaintiff purchased a 2011 Ford F-250, VIN 1FT7W2BT4FEA35517 (for the purpose of this paragraph, the "Class Vehicle") from a private seller in Oklahoma.  Prior to purchasing the Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Although Plaintiff was considering other vehicles, Plaintiff settled on the vehicle because Plaintiff relied upon Ford's claims touting the vehicle's durability, efficiency, fuel economy, power and performance of the engine.  These representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which

deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Plaintiff and each Ford Subclass Member has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle and would have paid less for it, had Defendants not concealed the CP4 fuel injection system defects. Plaintiff's and each Ford Subclass Member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff brings his claims individually and as a representative of the RICO Class and the Ford Subclass.

36.     Plaintiff Blake Gressett (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Hempstead, Texas. On or around July of 2005, Plaintiff purchased a 2013 Ford F350, VIN 17FTW2BT0DEA5544 (for the purpose of this paragraph, the "Class Vehicle") from private seller in Houston, Texas. Prior to purchasing the Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Although Plaintiff was considering other vehicles, Plaintiff settled on the vehicle because Plaintiff relied upon Ford 's claims touting the vehicle's durability, efficiency, fuel economy, power and performance of the engine. These representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a

defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Plaintiff and each Ford Subclass Member has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle and would have paid less for it, had Defendants not concealed the CP4 fuel injection system defects. Plaintiff's and each Ford Subclass Member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff brings his claims individually and as a representative of the RICO Class and the Ford Subclass.

37. Plaintiff Jimmy Orozco (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Goliad, Texas. On or around June of 2018, Plaintiff purchased a 2016 Ford F350, VIN 1FT8W3BT8GED22795 (for the purpose of this paragraph, the "Class Vehicle") from Port Lavaca Dodge in Port Lavaca, Texas. Prior to purchasing the Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Although Plaintiff was considering other vehicles, Plaintiff settled on the vehicle because Plaintiff relied upon Ford 's claims touting the vehicle's durability, efficiency, fuel economy, power and performance of the engine. These representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the

Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers.  Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Plaintiff and each Ford Subclass Member has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle and would have paid less for it, had Defendants not concealed the CP4 fuel injection system defects. Plaintiff's and each Ford Subclass Member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff brings his claims individually and as a representative of the RICO Class and the Ford Subclass.

38.     Plaintiff Joseph Anthony Stallone (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Gary, Texas.  On or around May of 2012, Plaintiff purchased a 2012 Ford F350, VIN 1FT8W3BT8CEA56043 (for the purpose of this paragraph, the "Class Vehicle") from Excel Ford in Carthage, Texas.  Prior to purchasing the Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Although Plaintiff was considering other vehicles, Plaintiff settled on the vehicle because Plaintiff relied upon Ford 's claims touting the vehicle's durability, efficiency, fuel economy, power and performance of the engine.  These representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life,

and the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers.  Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Plaintiff and each Ford Subclass Member has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle and would have paid less for it, had Defendants not concealed the CP4 fuel injection system defects. Plaintiff's and each Ford Subclass Member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff brings his claims individually and as a representative of the RICO Class and the Ford Subclass.

39.     Plaintiff Kevin Berry (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Spring Branch, Texas.  Prior to 2014, Plaintiff purchased a 2014 Jeep Grand Chrokee 4x4 Summit 3.0 Diesel, VIN 1C4RJFJM3EC373015 (for the purpose of this paragraph, the "Class Vehicle").  Prior to purchasing the Class Vehicle, Plaintiff was looking for a car that was durable, powerful, reliable, and could obtain the high mileage per gallon of a diesel vehicle. Although Plaintiff was considering other vehicles, Plaintiff settled on the vehicle because Plaintiff relied upon FCA's claims touting the vehicle's durability, efficiency, fuel economy, power and performance of the engine.  These representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of

its promised fuel economy and performance throughout its useful life, and the vehicle's reputation for maintaining a high resale value, induced Plaintiff to purchase the Class Vehicle. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Plaintiff and each FCA Subclass Member has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Class Vehicle and would have paid less for it, had Defendants not concealed the CP4 fuel injection system defects. Plaintiff's and each FCA Subclass Member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles.

## B. The Defendants

40. Defendant Robert Bosch GmbH is a corporation organized and existing under the laws of the Federal Republic of Germany, with its principal place of business at Robert Bosch Platz 1, 70839 Gerlingen, Germany. Robert Bosch GmbH, directly and/or through its North American subsidiary Robert Bosch, LLC, at all material times, designed, manufactured, and supplied elements of the defective and unsuitable CP4 fuel injection system to each Vehicle Manufacturer Defendant for use in the Class Vehicles.

41. Defendant Robert Bosch, LLC is a company organized under the laws of Delaware with its principal place of business at 38000 Hills Tech Drive, Farmington Hills, Michigan, 48331. Robert Bosch can be served with process through its agent CSC-Lawyers Incorporating Service

Company, 601 Abbot Road, East Lansing, Michigan, 48823. Robert Bosch, LLC, directly and/or in conjunction with its parent Robert Bosch GmbH, at all material times, designed, manufactured, and supplied elements of the defective and unsuitable CP4 fuel injection system to each Vehicle Manufacturer Defendant for use in the Class Vehicles.

42.     At all relevant times, Robert Bosch GmbH, Robert Bosch, LLC, and currently unnamed Bosch employees (together, "Bosch") were knowing and active participants in the creation, development, marketing, and sale of CP4 fuel injection systems that were defective and/or not properly suited for American vehicles. Both Robert Bosch GmbH and Robert Bosch, LLC operate under the umbrella of the Bosch Group, which encompasses some 340 subsidiaries and companies. The Bosch Group is divided into four business sectors: Mobility Solutions (formerly Automotive Technology), Industrial Technology, Consumer Goods, and Energy and Building Technology. The Mobility Solutions sector, which supplies parts to the automotive industry, and its Diesel Systems division, which develops, manufactures, and supplies diesel systems, are particularly relevant here and include the relevant individuals at both Robert Bosch GmbH and Robert Bosch, LLC. Bosch's sectors and divisions are grouped not only by location, but by subject-matter. Mobility Solutions includes the relevant individuals at both Robert Bosch GmbH and Robert Bosch, LLC. Regardless of whether an individual works for Bosch in Germany or in the U.S., the individual holds himself/herself/itself out as working for Bosch. This collective identity is captured by Bosch's mission statement: "We are Bosch," an underlying principle that unifies and links each entity and person within the Bosch Group.

43.     Defendant General Motors LLC ("GM") is a Delaware corporation with its headquarters and principal place of business located in Detroit, Michigan. Defendant General Motors LLC can be served with process through its agent The Corporation Company, 30600

Telegraph Road Ste. 2345, Bingham Farms, Michigan, 48025. The sole member and owner of General Motors LLC is General Motors Holdings LLC. General Motors Holdings LLC is a Delaware limited liability company with its principal place of business in the State of Michigan.

44.     Defendant GM, through its various entities, including Chevrolet and GMC, designs, manufactures, distributes, and sells GM automobiles in this District and multiple other locations in the United States and worldwide. GM and/or its agents designed, manufactured, and installed the engine systems in the Class Vehicles. GM also developed and disseminated the owner's manuals and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles.

45.     Defendant Ford Motor Company ("Ford") is a publicly traded corporation organized under the laws of the State of Delaware with its principal place of business at One American Road, Dearborn, Michigan 48126. Defendant Ford Motor Company can be served with process through its agent The Corporation Company, 40600 Ann Arbor Road E. Ste. 201, Plymouth, Michigan, 48170.

46.     Defendant Ford, through its various entities, designs, manufactures, distributes, and sells Ford automobiles in this District and multiple other locations in the United States and worldwide. Ford and/or its agents  designed, manufactured, and installed the engine systems in the Class Vehicles. Ford also developed and disseminated the owner's manuals and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles.

47.     Defendant FCA US LLC, formerly known as Chrysler Group and renamed FCA US LLC ("FCA"), is a company organized and existing under the laws of Delaware, having a principal place of business at 1000 Chrysler Dr., Auburn Hills, MI 48326. FCA is a business entity registered with the state of Delaware and regularly conducts and transacts business in this

jurisdiction, throughout the United States, and within the District of Delaware, either itself or through one or more subsidiaries, affiliates, business divisions, or business units. Defendant FCA can be served through its registered agent The Corporation Trust Company, 229 Brookwood Drive. Ste. 14, South Lyon, Michigan, 48178.

48.     Defendant FCA through its various entities, designs, manufactures, distributes, and sells FCA automobiles in this District and multiple other locations in the United States and worldwide under the Jeep, Dodge, Chrysler and Fiat brand names.  Defendant FCA, and/or its agents designed, manufactured, and installed the engine systems in the Class Vehicles.  Defendant FCA also developed and disseminated the owner's manuals and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles.

49.     Defendant VM Italy is an Italian corporation that, among other things, designs and manufactures diesel-fueled motor vehicle engines. In 2011, FCA NV (known as Fiat S.p.A. at the time) acquired a 50 percent ownership interest in VM Italy. In October 2013, VM Italy became an indirect wholly-owned subsidiary of FCA NV. VM Italy is an affiliate of Defendant FCA US. The corporate headquarters of VM Italy is in Cento, Italy. VM North America was created to support the North American customers of VM Italy. VM North America was incorporated under the laws of the State of Delaware in 2004. VM North America ceased to be a corporation in good standing under laws of the State of Delaware due to a failure to pay required annual taxes and/or fees in 2015 and 2016. VM Italy and VM North America are, together, referred to as "VM Motori."

### III.     VENUE AND JURISDICTION

50.     Venue is proper in this District under 28 U.S.C. § 1391 because: (1) all Defendants conduct substantial business in this District and have intentionally availed themselves of the laws and markets of the United States and this District; and/or (2) many of the acts and transactions

giving rise to this action occurred in this District, including, *inter alia,* the Vehicle Manufacturer Defendants' promotion, marketing, distribution, and sale of vehicles containing Bosch's high injection CP4 fuel pump known in this District. Several named Plaintiffs and proposed representatives, as well as tens of thousands of Class Members, purchased their Class Vehicles from the multiple GM, Ford, and FCA dealerships located in this District. Further, a significant number of the Class Vehicles were registered in this District and thousands of Class Vehicles were in operation in this District. Venue is also proper under 18 U.S.C. § 1965(a) because Defendants are subject to personal jurisdiction in this District, as alleged *infra*, and Defendants have agents located in this District.

51.    The Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one Class Member is of diverse citizenship from one Defendant, there are more than 100 Class Members, and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interests and costs. Subject-matter jurisdiction also arises under 28 U.S.C. § 1331 based upon the federal RICO claims asserted under 18 U.S.C. § 1961, *et seq.*, as well as the Magnuson-Moss Warranty Act claims asserted under 15 U.S.C. § 2301, *et seq.* The Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. §§1965(b) and (d), and Tex. Civ. Prac. & Rem. Code § 17.042, and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

52.    This Court has personal jurisdiction over each Defendant. Each Defendant has committed and continues to commit acts giving rise to this action within Texas and within this judicial District. Each Defendant has established minimum contacts within the forum such that the exercise of jurisdiction over each Defendant would not offend traditional notions of fair play and substantial justice. In conducting business in Texas and this judicial District, each Defendant

derives substantial revenue from its activities and its products being sold, used, imported, and/or offered for sale in Texas and this judicial District.

## IV.  FACTUAL ALLEGATIONS

### A.  The Rise of Diesel Vehicles in the United States.

53.     Diesel engines have long enjoyed a loyal following in some U.S. market segments because of their reliability, fuel efficiency, and power.  Diesel engines produce higher torque, even at low revolutions per minute (RPM), making them popular in buses, heavy-duty pickups, and vans, including commercial vehicles, farm trucks, and ambulances.

54.     With the invention of common-rail systems, diesel fuel was injected at higher pressure, forming a finer mist that increases fuel efficiency and power.  Common-rail systems also made diesel engines burn cleaner and with less noise.  While diesel had long been popular overseas, these advances fueled a growing market here in the U.S. for diesel trucks, and even diesel passenger cars.

55.     From the outset, Ford and GM were in competition with each other, each racing to dominate the growing American diesel vehicle market.  Both Ford and GM looked to Europe and the expertise of Bosch to increase the fuel efficiency and power of their diesel engines.  The heart of this diesel revolution would be powered by Bosch's extremely durable CP3 fuel injection pump.  The CP3 pump was one of Bosch's heavy-duty injection pumps, simplified for increased reliability.  The reliability of the CP3 became key to the "million-mile" performance of diesel truck engines in the US.  American trust in diesel technology grew.

56.     Americans paid a premium for the increased reliability, fuel efficiency, and power of diesel—and Bosch promised to continue to deliver advances and continued improvements.

Bosch claimed that the next generation of fuel pump, the CP4, would maintain reliability while also increasing fuel efficiency and power.

57.     However, much like what occurred in the nationwide Volkswagen emissions scandal involving Bosch, reliance on Bosch's expertise in the design of diesel engines would lead American automobile manufacturers into a crisis they should now regret. The heart of the automotive giants' success under increasingly competitive fuel efficiencies was Bosch's fuel injection pump. Bosch had the technical know-how to do what needed to be done to get ahead— unfortunately for the American public, the easiest way to win was to cheat. The question for automobile manufacturers was who to cheat. American diesel manufacturers could cheat the EPA and misrepresent fuel efficiency, or they could cheat the consumers on durability. With regard to the fuel injection system, the defendants chose to cheat consumers. The affected vehicles get better mileage, but they are ticking time bombs for consumers who are left to pick up the pieces.

**B. Ford's PowerStroke Engines Contained the Bosch CP4 Pump.**

58.     Since 1994, Ford has marketed a "Power Stroke" diesel engine. But this original "Power Stroke" engine was actually designed and manufactured by Navistar International, not Ford. Ford relied on the expertise of Navistar, originally known as the International Harvester Company, from Chicago, Illinois, and re-branded the popular engine as its own. The Navistar produced "Power Stroke" engine enjoyed a reputation for reliability. Ford utilized the Navistar 7.3L "Power Stroke" engine until the year 2003, and it enjoyed a reputation as possibly the best engine Navistar ever produced.

59.     Seeking to gain an advantage, Ford began a long partnership with Bosch in 2004. But from the beginning, Ford was aware of a mismatch between Bosch's European fuel injection pumps and American diesel fuel. Ford was also alarmed at the high stakes of a pump failure if it

were covered under warranty. In an email, a Ford fuel injection engineer referenced a trip to Germany to meet with Bosch and some photos that Bosch may share. The attachment to his email stated:

> U.S. diesel standards (ASTM D975) allow up to 500 ppm water content in fuel; European specifications (EN590) allow 200 ppm max. More variation in U.S. Consumer fuel sources and fuel quality vs. European markets – high volume truck stops vs. low volume neighborhood gas stations equipped w/diesel, use of off-road diesel fuel by some consumers, etc. . . failure mode in one component, entire system (all injectors, pump, rails and lines) would require replacement – major warranty expense component…

10/21/2004 email from Dave Eastman of Ford's Diesel Fuel Injection Systems Department.

60. In connection with this problem, in 2009, Ford was discussing the decreased lubricity of ultralow sulfur American diesel ("ULSD"). A November 17, 2009 email from Brien Fulton, Diesel Powertrain Systems Technical Specialist at Ford, to Beth Raney-Pablo from the Fuels and Lubricants Engineering Department at Ford stated: "[T]he data does contain some ULSD which due to the process to remove sulfur tends to reduce lubricity." A November 13, 2009 email from Brien Fulton to Scott Eeley at Ford stated: "You need to be aware of the current fuel lubricity levels . . . we have lots of fuel above 520 [micrometers]."

61. Thus, it is clear that Ford was concerned about the lubricity and uniformity of American diesel for its engines, and was aware of the cost to the consumer if the injection pump were to fail.

62. In 2010, Ford sought to increase its profits by making its own diesel engines, and it continued to work with Bosch for the design of the fuel injection system. Under the leadership of Derrick Kuzak, group vice president of Global Product Development, Ford advertised that its "new diesel engine will deliver significant improvements in torque, horsepower, and fuel economy while adding more fueling flexibility." "A New Era in Ford Diesel Technology for Pickups Starts

Now," Ford Social, available at: https://social.ford.com/en_US/story/design/super-duty/a-new-era-in-ford-diesel-technology-for-pickups-starts-now.html (last accessed Oct. 1, 2018). For 2011, Kuzak promised, "This all-new diesel engine has been so extensively tested both in the lab and in the real world that we're confident we're giving our customers the most reliable and productive powertrain available today." *Id*. Ford claimed that the new Power Stroke engine could utilize up to 20% biodiesel. *See id*. However, in order to achieve greater fuel efficiency, the Power Stroke engine incorporated a newer, lower-volume fuel injection pump, Bosch's CP4 pump.

63. At least as early as 2010, Ford began looking for ways to blame consumers or fuel supplies for the poor performance of their CP4 pumps:

> 2008-2011 Super Duty, equipped with the diesel engine that have been filled with gasoline, incorrect diesel fuel or other non-diesel fuels can damage the fuel system components, including the High-Pressure Injection Pump and fuel injectors. Non-recommended fuels and additives do not meet the lubricating, cooling and anti-corrosion properties that is required of the fuel system components.

9/8/2010 TSB email by Tony Lusardi, Product Concern Engineer for the 6.7L Diesel. Rather than acknowledge the problems with the Bosch CP4 Pump and American diesel fuel as the cause of engine troubles, Bosch and Ford would point to fuel contamination, a condition not covered under warranty.

64. On February 7, 2011, as the first models of the Class Vehicles were being sold, NHTSA investigated Ford for a potential defect in its predecessor diesel high pressure fuel injection pumps. The scope of the investigation was the 2008-2012 Super Duty F-Series trucks (NHTSA defect investigation EA11-003:NVS-213hkb).

65. Ford was clearly on notice that American fuel did not meet the specifications of the Bosch CP4 Pump. Any reasonable person would think that Ford and Bosch would provide a more lubricated or robust pump design going forward, but they did not. The affected Ford vehicles

containing the Bosch CP4 Pump are 2011—2016 Ford Pickups with 6.7L Power Stroke engines, and the owners are saddled with the expense of Defendants' poor design choice.

**C. GM Duramax Engines Contained the Bosch CP4 Pump.**

66.     GM also set out to design a modern diesel engine for its pickup trucks. In 2000, GM formed a joint venture with Isuzu, called "DMAX" to create the 6.6L Duramax V8 engine. DMAX then teamed up with Robert Bosch GmbH to incorporate Bosch's high pressure common-rail for fuel injection. Two years later, the Duramax engine had garnered 30% of the U.S. market for diesel pickup trucks. The Duramax engine has long been an option on GM pickups, vans, and medium-duty trucks, and has undergone many changes over the years.

67.     For 2010, GM created the LGH version of the Duramax engine. It featured increased power, increased torque, and greater fuel efficiency. But, in order to achieve greater fuel efficiency, the Duramax LGH engine incorporated a newer, lower-volume fuel injection pump, Bosch's CP4 pump.

68.     In 2011, the LML version of the Duramax engine was introduced by GM. The Duramax LML engine claimed to improve durability while increasing fuel injection pressure to 29,000 psi, increasing noise reduction and also tolerating up to 20% biodiesel fuel mixtures, and added a urea-based diesel exhaust fluid (DEF) system to treat its exhaust. The Duramax LML continued to use the new lower-volume Bosch CP4 fuel injection pump, including but not limited to, in the following vehicles:

- 2011-2016 2500HD Silverado 6.6L V8 Duramax Diesel Trucks with LML engines

- 2011-2016 3500HD Silverado 6.6L V8 Duramax Diesel Trucks with LML engines

- 2011-2016 2500HD Sierra 6.6L V8 Duramax Diesel Trucks with LML engines

- 2011-2016 3500HD Sierra 6.6L V8 Duramax Diesel Trucks with LML engines

- 2010-2011 Chevrolet Express van with Duramax LHG Engines

- 2010-2011 GMC Savana van with Duramax LHG Engines

- 2010-2011 GMC Sierra trucks with RPO ZW9 (chassis cabs or trucks with pickup box delete) with Duramax LHG Engines

- 2011-2012 2500HD 3500 Silverado 6.6L V8 Duramax Diesel Trucks with LGH engines

- 2011-2012 2500HD 3500 Sierra 6.6L V8 Duramax Diesel Trucks with LGH engines

69.     Some of these vehicles are modified for commercial purposes, such as cargo vans, specialized work trucks, and a variety of ambulances offered by GM. The CP4 has long experienced problems, and the failure of these pumps can be devastating to people and businesses alike.

**D. FCA/Chrysler/Jeep/Dodge EcoDiesel Engines Contained the Bosch CP4 Pump.**

70.     GM was a 50 percent owner of VM Motori from 2003 until 2013. The affected FCA diesel engines were manufactured by VM Motori in Italy, which is now 100% owned by Fiat Group Automobiles, a subsidiary of Fiat Chrysler Automobiles. Fiat Chrysler Automobiles previously purchased a 50 percent stake in VM Motori in 2011, and in 2013 it purchased the remaining shares from GM.

71.     FCA/Jeep had previously attempted and failed to successfully enter the diesel market. But together with Bosch, VM Motori designed the V6 3.0L EcoDiesel engine. Like the affected GM vehicles, it would contain the Bosch CP4 Pump.

72.     The year after FCA/Chrysler purchased the remainder of VM Motori from GM, it released the new diesel engine. The EcoDiesel engine was utilized from 2014-2016 in Jeep Grand Cherokees and Dodge Ram trucks. The design included the high pressure CP4 fuel injection pump to provide increased fuel efficiency and power, and therefore, these vehicles experience the same devastating failures as their Ford and GM counterparts.

73.     Despite knowing that the Bosch CP4 Pumps would fail in the Class Vehicles when used with American diesel fuel (the fuel intended by FCA/Chrysler and consumers to be used in the Class Vehicles), FCA/Chrysler touted the durability, reliability and fuel efficiency of the Class Vehicles.

**E. Defendants' Knowledge of Incompatibility, Defectiveness, and Failures Associated with Bosch's CP4 Pump.**

74.     The Bosch CP4 Pump operates at higher pressures than its predecessor, the CP3. The CP4 achieves greater fuel efficiency by pumping less fuel through the engine. The Bosch CP4 Pump had a proven track record in Europe, but it is not compatible with American diesel fuel.

75.     The CP4 relies on the diesel fuel itself to maintain lubrication. The lubricity of diesel in Europe is more standardized than American diesel, but European diesel is also dirtier. Because the sulfur in diesel exhaust is a major cause of smog and acid rain, in 2007, the EPA required diesel fuel sold in the U.S. to have less than 15 ppm of sulfur. This is known as Ultra Low Sulfur Diesel ("ULSD"). It is produced through a refinery process known as hydrodesulfurization ("HDS"). Sulfur provides some of the lubricity needed for the pump to operate. But more importantly, the refinery process required to produce low sulfur diesel destroys a variety of important nitrogen and oxygen based polar and organic compounds that give diesel fuel its lubricity. As a result, American diesel does not contain the lubrication necessary for the Bosch CP4 Pump to operate durably.

76.     Low sulfur diesel fuel first appeared in American markets in the 1990's, with fewer than 500 ppm of sulfur. It is estimated that 65 million fuel injection pumps failed as a result. It was thought that the pumps failed at the equivalent of 100 to 200 hours of operation. Thus, the critical importance of lubricity for diesel injection pumps was well known to all auto

manufacturers for a decade or more before the Class Vehicles were designed or introduced into the market.

77.     Engine manufacturers were well aware of the mismatch between engine part specifications that require a maximum of 460 wear scar, and the lower lubricity specifications of Ultra Low Sulphur American diesel fuel:

> Lubricity describes the ability of a fluid to minimize friction between, and damage to, surfaces relative to motion under loaded conditions. Diesel fuel injection equipment relies on the lubricating properties of fuel. Shortened life of engine components such as fuel injection pumps and unit injectors can usually be attributed to lack of fuel lubricity and, hence, lubricity is of concern to engine manufacturers. This property is not addressed adequately by ASTM D 975.

4/22/2002 Engine Manufacturers' Association, Position Statement titled, "EMA Consensus Position Pump Grade Specification." The Vehicle Manufacturer Defendants are members of the Engine Manufacturers' Association.

78.     Further, the Engine Manufacturers' Association made clear:

> Regardless of the fuel sulfur level, ASTM D975 currently requires lubricity specified as a maximum wear scar diameter of 520 micrometers using the HFRR test method (ASTM D6079) at a temperature of 60°C. Based on testing conducted on ULSD fuels, however, fuel injection equipment manufacturers have required that ULSD fuels have a maximum wear scar diameter of 460 micrometers. EMA recommends that the lubricity specification be consistent with the fuel injection equipment manufacturers' recommendation.

8/8/2005 Engine Manufacturers Association, Position Paper titled "North American Ultra Low Sulfur Diesel Fuel Properties."

79.     In 2005, the EPA instituted a lubricity requirement for the lower sulfur diesel sold in the U.S. It required sellers of diesel to ensure the fuel meets a minimum lubricity level of a maximum wear scar diameter of 520 microns based on the testing and standard propounded by the American Society for Testing and Materials (ASTM) D-975. A prudent manufacturer would design or select a fuel injection pump designed for this low lubricity fuel.

80. Yet, Bosch provided the Bosch CP4 Pump for Ford's Power Stroke engines and GM's Duramax engines in the 2010 and 2011 model years. It was no secret to any of them that the Bosch CP4 Pump is inappropriate for diesel vehicles in the U.S. The Bosch CP4 Pump specifications for fuel lubricity allow for a maximum of 460 wear scar. By definition, the 520 wear scar specification of American diesel fuel is inadequate to lubricate the Bosch CP4 Pump. In order to increase fuel efficiency, Ford and GM sold vehicles with a fuel injection pump that was clearly out of specification, having inadequate lubrication for the U.S. market. The CP4 is, by its own specifications, expected to fail quickly when used in the U.S.

81. The Bosch CP4 Pump multiplies the diesel fuel problem in ways that are catastrophic. The Vehicle Manufacturer Defendants chose the Bosch CP4 Pump because it was supposed to improve fuel efficiency by using less fuel. The Bosch CP4 Pump struggles to supply adequate fuel to the engine under the lower pressure of newer engines. The combination of the low volume of fuel, which is under constant suction, and the low lubricity of the fuel, allows cavitation of the fuel. Air pockets form inside the pump during operation. These air bubbles allow metal to rub against metal. The Vehicle Manufacturer Defendants had achieved greater fuel efficiency at the expense of running the pump dry.

82. As the Bosch CP4 Pump wears, it sends metal shavings throughout the fuel system. The Bosch CP4 Pump often fails catastrophically at around 100,000 miles. At that point, even larger pieces of metal contaminate the engine and the high-pressure fuel system. The failure of a CP4 pump requires repair or replacement of the entire high-pressure fuel system, including the pump, fuel injectors, fuel rails, and injection lines. Repair costs when a CP4 pump fails average between $8,000.00 and $15,000.00.

**F. Supposed "Remedies" are Insufficient and Costly.**

83.     The Bosch CP4 Pump problem is so prevalent that several manufacturers now provide kits to mitigate or prevent the harm.  "Disaster Preventer Kits" or "bypass kits" usually refer to a fuel bypass system that does not prevent the failure, the loss of the expensive injection pump, or the need to clean metal shavings from the fuel system.  But these kits are designed to redirect the lubricating fuel for the CP4 back to the fuel tank, so that it will be filtered before it returns to the engine.  The bypass kit directs the fuel contaminated with metal shavings into the gas tank, which is less expensive to clean than the engine and high-pressure fuel system.  These bypass kits are also less expensive than more complete remedies, requiring only $360.00 in parts.

84.     Another method of addressing the Bosch CP4 Pump failure is to modify the Class Vehicles to return to the older, more reliable technology of simply using more fuel.  With Duramax engines, the strategy may be simply to buy a CP3 pump and use it in place of the Bosch CP4 Pump.  The reliable CP3 pump is still in use on some vehicles, and is available new for purchase.  However, resorting to this "remedy" fails to make consumers whole because they are not getting the fuel efficiency promised with the Bosch CP4 Pump, and for which they paid a premium.

85.     Another potential "remedy" is to leave the CP4 in place on the Class Vehicle, but install a lift pump, a second pump to assist the Bosch CP4 Pump and increase the fuel pressure.  But, again, this "remedy" deprives consumers of the fuel-efficiency for which they paid a premium.

86.     The lift pump and CP3 pump options remedy part of the problem by pumping and burning more fuel.  So, in addition to the expense of buying a new fuel injection pump, the "remedies" would require owners to purchase more fuel.

87.     A fourth way to mitigate the damage is to spend money for fuel additives to increase the lubricity of the fuel.  This approach may work best in conjunction with the previously discussed modifications, but even by itself, it can be expensive.

88.     In short, there is no known way to remedy or mitigate CP4 pump failure without decreasing the fuel efficiency promised to Plaintiffs and other Class Members and without significant expense to Plaintiffs and other Class Members.

## G. The Vehicle Manufacturer Defendants' Warranties and Common Claims of Durability and Superiority Regarding the Bosch CP4 Pump.

89.     Ford's 2011 Super Duty truck brochures for the 6.7L Power Stroke engine equipped vehicles emphasized the "impressive fuel economy" and "DURABILITY: Super duty is built to the extremely high standards of durability and reliability you'd expect in a full-size pickup that's Built Ford Tough."  Ford also provided an express five year/100,000 mile written warranty with Class Vehicles it manufactured.

90.     GM's 2011 Chevy Silverado HD truck brochure boasts of an 11% increase in fuel efficiency while claiming the durability of its predecessors, "PROVEN DURABILITY[:] The Duramax-Allison combination continues to build on its proven reliability." GM also provided an express 60-month, 100,000-mile written warranty with Class Vehicles it manufactured.

91.     FCA's 2014 Jeep Grand Cherokee brochures tout the new 3.0L EcoDiesel engine, claiming it "treats your fuel budget with respect," with "EFFICIENCY—30 MPG."  FCA's promotion of the new diesel Jeep Cherokee was as being as tough as its predecessors, while adding "refinement."  The efficiency of FCA/Chrysler's EcoDiesel-equipped Ram trucks was promoted with the phrase, "SAY HELLO TO LOWER COST OF OWNERSHIP."

92.     FCA's 2014 Ram 1500 brochure reads, "YOU DEMANDED FUEL-EFFICIENT CAPABILITY."   Like Ford and GM, the FCA/Dodge Ram truck was promoted as having the reliability of its predecessors, with statements in its brochure like "Long-proven in tough commercial applications." FCA/Chrysler claimed that the EcoDiesel Dodge Ram trucks were durable in spite of varying fuel quality… Fuel sources vary in quality … The available 3.0L EcoDiesel V6 utilizes dual-filtration technology for greater … durability."   FCA/Chrysler even boasted, "IT COULD BE ARGUED THAT EVEN OUR RELIABILITY LEADS THE CLASS."

93.     FCA/Chrysler also provided an express 5-year/100,000-mile written warranty on the Class Vehicles it manufactured.

94.     Vehicle Manufacturer Defendants have refused to honor their warranties, deviously claiming that the metal shavings caused by the failures of their pump design voided the warranty because they also caused fuel contamination.

**H. The Vehicle Manufacturer Defendants Designed, Manufactured and Sold Vehicles they Knew Would Experience Catastrophic Failures Defendants Would Not Honor Under Their Warranties.**

95.     Despite the clear mis-match between the Bosch CP4 Pump and American diesel fuel, the Vehicle Manufacturer Defendants have cleverly passed the $8,000.00 to $15,000.00 cost of failure to the consumer.   The Vehicle Manufacturer Defendants' Dealerships are determining that CP4 pump failures are not under warranty.   The logic is that when a CP4 pump fails, it launches metal debris into the high-pressure fuel system and the engine.   Warranties do not cover the use of contaminated fuel.   Because the fuel is now contaminated with metal from the pump, the repairs are for fuel contamination and are not covered by the warranties.

96.     The Vehicle Manufacturer Defendants, acting in concert with Bosch and VM Motori, induced Plaintiffs and other Class Members to pay a premium for increased durability,

performance and fuel efficiency, with a design all Defendants have long known would cause fuel contamination—a condition Defendants now use to absolve themselves of the catastrophic and costly consequences to Plaintiffs and other Class Members.

## V.     TOLLING OF THE STATUTE OF LIMITATIONS

97.     As of the date of this Complaint, Defendants continue to market their vehicles based on superior durability, performance, and fuel efficiency, despite their knowledge that the Class Vehicles are defective and have failed or will fail—Defendants still have not disclosed and continue to conceal that the Class Vehicles are defective, incompatible with American diesel fuel, and will experience catastrophic and costly failure.

98.     Until shortly before the filing of this Complaint, Plaintiffs and other Class Members had no way of knowing about Defendants' wrongful and deceptive conduct with respect to their defective Class Vehicles.

99.     With respect to Class Vehicles that have not experienced CP4 pump failure, Plaintiffs and other Class Members did not discover and could not reasonably have discovered that their Class Vehicles are defective, that their Class Vehicles are out of specification and incompatible with American diesel fuel, that this incompatibility has resulted in the breakdown of fuel components and contamination of fuel caused by the defective CP4 fuel pump, that their CP4 fuel pumps will fail, that the durability and performance of their Class Vehicles is impaired by this defect and incompatibility and that such durability and performance is far less than Defendants promised, or that, as a result of the foregoing, they overpaid for their vehicles, the value of their vehicles is diminished, and/or their vehicles will require costly modification to avoid a catastrophic even more costly failure, and that any such modifications will impair other qualities of the Class

Vehicles that formed a material part of the bargain between the parties in the purchase of the Class Vehicles by Plaintiffs and other Class Members.

100. With respect to Class Vehicles that have experienced CP4 pump failure prior to the filing of this Complaint, Plaintiffs and other Class Members did not discover and could not reasonably have discovered that their CP4 pump failure was due to a defect known to Defendants or that such failure was due to an incompatibility between the Class Vehicle and the fuel intended by Defendants to be used in the Class Vehicles.

101. Within the time period of any applicable statutes of limitation or repose, Plaintiffs and members of the proposed classes could not have discovered through the exercise of reasonable diligence that Defendants were concealing the conduct complained of herein and misrepresenting the defective nature of the Class Vehicles.

102. Plaintiffs and other Class Members did not discover, and did not know of facts that would have caused a reasonable person to suspect that Defendants did not report information within their knowledge to consumers, dealerships or relevant authorities; nor would a reasonable and diligent investigation have disclosed that Defendants were aware of the non-conforming and defective nature of the CP4 fuel pump and the Class Vehicles in which it was incorporated. Plaintiffs only learned of the defective nature of the CP4 fuel injection pump and their vehicles and of Defendants' scheme to design and sell such non-conforming and defective fuel pumps and vehicles only shortly before this action was filed.

103. All applicable statutes of limitation and repose have also been tolled by Defendants' knowing, active, and fraudulent concealment, and denial of the facts alleged herein throughout the time period relevant to this action.

104.    Instead of disclosing the defective nature of the CP4 fuel pumps to consumers, Defendants falsely represented that CP4 pump failure in the Class Vehicles was caused by Plaintiffs' or other Class Members' conduct or by the use of contaminated fuel.

105.    In reality, Defendants' conduct in designing, manufacturing, marketing or selling Class Vehicles for use with American diesel fuel, with which Defendants knew the Class Vehicles were incompatible, causes the "fuel contamination" that ultimately leads to CP4 pump failure.

106.    Defendants, with the purpose and intent of inducing Plaintiffs and other Class Members to refrain from filing suit, pursuing warranty remedies, or taking other action with respect to Defendants' conduct or the Class Vehicles, fraudulently concealed the true cause of CP4 pump failure by blaming Plaintiffs, Class Members and/or contaminated fuel when Defendants, even before the design, manufacture or sale of the Class Vehicles, knew that the defective nature of the Bosch CP4 Pump would and has caused fuel contamination and resulting CP4 pump failure.

107.    Defendants were under a continuous duty to disclose to Plaintiffs and other Class Members the true character, quality and nature of the durability and performance of Class Vehicles, the ongoing process of fuel contamination in Class Vehicles, CP4 pump failure, and the true cause of CP4 pump failure—Instead, Defendants knowingly, affirmatively, and actively concealed or recklessly disregarded the foregoing facts. As a result, Defendants are estopped from relying on any statutes of limitation or repose as a defense in this action.

108.    For the foregoing reasons, all applicable statutes of limitation and repose have been tolled by operation of the discovery rule and by Defendants' fraudulent concealment with respect to all claims against all Defendants; and, Defendants are estopped from asserting any such defenses in this action.

## VI.    CLASS ACTION ALLEGATIONS

109. Throughout this Complaint, "Class Vehicle" is defined as any vehicle fitted with (or fitted with at the point of sale) a Bosch CP4 fuel pump.

110. This is a class action brought pursuant to Federal Rule of Civil Procedure 23 on behalf the following Class and Subclasses (collectively "the Class"):

**a. The RICO Class**

All persons or entities in the state of Texas who are current or former owners and/or lessees of a Class Vehicle. Class Vehicles include, without limitation, all vehicles identified in the Vehicle Manufacturer Subclasses.

**b. The Vehicle Manufacturer Subclasses**

The following subclasses are collective referred to as the "Vehicle Manufacturer Subclasses."

**i. The GM Subclass**

All persons or entities in the state of Texas who are current or former owners and/or lessees of a Class Vehicle designed, manufactured, marketed and/or sold by GM.

**ii. The Ford Subclass**

All persons or entities in the state of Texas who are current or former owners and/or lessees of a Class Vehicle designed, manufactured, marketed and/or sold by Ford.

**iii. The FCA Subclass**

All persons or entities in the state of Texas who are current or former owners and/or lessees of a Class Vehicle designed, manufactured, marketed and/or sold by FCA.

111. Excluded from the RICO Class and Vehicle Manufacturer Subclasses are governmental entities, Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns. Also excluded from the RICO Class and Vehicle Manufacturer Subclasses are any judge, justice, or judicial officer presiding over this matter and

the members of their immediate families and judicial staff. Also excluded from the RICO Class and Vehicle Manufacturer Subclasses are claims arising from individual personal injuries.

112.    The putative RICO Class and Vehicle Manufacturer Subclasses are composed of thousands of natural persons, sufficiently numerous, the joinder of whom is impractical. The disposition of their claims in a class action will provide substantial benefits both to the parties and the Court. There is a well-defined community of interest in the questions of law and fact involved and affecting the parties to be represented. The questions of law and fact common to the RICO Class and Vehicle Manufacturer Subclasses predominate over questions which may affect the RICO Class and Vehicle Manufacturer Subclasses Plaintiffs, respectively. The number of persons for whom this action is filed who are citizens of Texas effectively exhausts the membership of the class, with the potential exception of some few, but unknown, transients in Texas or residents of Texas who happen to be citizens of other states.

113.    The Class Representatives are asserting claims that are typical of claims of the RICO Class and their respective Vehicle Manufacturer Subclasses, and they will fairly and adequately represent and protect the interests of the RICO Class and their respective Vehicle Manufacturer Subclasses in that they have no interests antagonistic to those of the putative RICO Class and their respective Vehicle Manufacturer Subclasses.

114.    The amount of damages suffered by each individual member of the RICO Class and their respective Vehicle Manufacturer Subclasses, in light of the expense and burden of individual litigation, would make it difficult or impossible for individual members of the Class and Subclasses to redress the wrongs done to them. Plaintiffs and other members of the RICO Class and Vehicle Manufacturer Subclasses have all suffered harm and damages as a result of Defendants' unlawful and wrongful conduct. Absent a class action, Defendants will likely not

have to compensate victims for Defendants' wrongdoings and unlawful acts or omissions, and will continue to commit the same kinds of wrongful and unlawful acts or omissions in the future.

115. **Numerosity under Federal Rule of Civil Procedure 23(a)(1):** The RICO Class and Vehicle Manufacturer Subclasses are so numerous that individual joinder of all of their members is impracticable. Due to the nature of the trade and commerce involved, Plaintiffs believe that the total number of Class Plaintiffs is at least in the thousands and members of the RICO Class and Vehicle Manufacturer Subclasses are numerous and geographically dispersed across Texas. While the exact number and identities of members of the RICO Class and Vehicle Manufacturer Subclasses are unknown at this time, such information can be ascertained through appropriate investigation and discovery. The disposition of the claims of members of the RICO Class and Vehicle Manufacturer Subclasses in a single class action will provide substantial benefits to all Parties and the Court. Members of the RICO Class and Vehicle Manufacturer Subclasses may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

116. **Commonality and Predominance under Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3):** This action involves common questions of law and fact which predominate over any questions affecting individual Class Members, including, without limitation:

  c.  Whether Bosch, VM Motori, and the Vehicle Manufacturer Defendants knew about the CP4 defects and problems when used with American diesel fuel and, if so, how long Defendants have known;

  d.  Whether Bosch's, VM Motori's, and the Vehicle Manufacturer Defendants' conduct violates RICO and consumer protection statutes, and constitutes breach of contract or warranty and fraudulent concealment, as asserted herein;

e.   Whether there is an Enterprise;

f.   Whether Bosch  and/or VM Motori participated in the Enterprise;

g.   Whether Plaintiffs and the other Vehicle Manufacturer Subclass Members overpaid for their vehicles; and

h.   Whether Plaintiffs and the other Vehicle Manufacturer Subclass Members are entitled to damages and other monetary relief and, if so, what amount.

117.   **Typicality under Federal Rule of Civil Procedure 23(a)(3):** Plaintiffs' claims are typical of the claims of the members of the RICO Class and the respective Vehicle Manufacturer Subclasses.   Specifically, all Plaintiffs and all members of the RICO Class and Vehicle Manufacturer Subclasses have been comparably injured through Bosch's wrongful conduct and by the concerted unlawful conduct of all Defendants as described above. Further, the Representative Plaintiffs for the GM Subclass and all GM Subclass members have been comparably injured through GM's conduct as described above; the Representative Plaintiffs for the Ford Subclass and all Ford Subclass members have been comparably injured through Ford's conduct as described above; and the Representative Plaintiffs for the FCA Subclass and all FCA Subclass members have been comparably injured through FCA's conduct as described above.

118.   **Adequacy of Representation under Federal Rule of Civil Procedure 23(a)(3):** Plaintiffs are adequate RICO Class Representatives and adequate Representatives for their respective Vehicle Manufacturer Subclasses because their interests do not conflict with the interests of the other members of the Classes and Subclasses they seek to represent.   Additionally, Plaintiffs have retained counsel with substantial experience in handling complex class action litigation.   Plaintiffs and their counsel are committed to prosecuting this action vigorously on

behalf of the Class and Subclasses and have the financial resources to do so. The interests of the Class and Subclasses will be fairly and adequately protected by Plaintiffs and their counsel.

119.    **Superiority of Class Action under Federal Rule of Civil Procedure 23(b)(3):** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The financial detriment suffered by Plaintiffs and the other members of the RICO Class and the respective Vehicle Manufacturer Subclasses are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants. Accordingly, it would be impracticable for the members of the RICO Class and the Vehicle Manufacturer Subclasses to individually seek redress for Defendants' wrongful conduct. Even if members of the RICO Class and the Vehicle Manufacturer Subclasses could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VII.    CAUSES OF ACTION

### A.  Claims Brought on Behalf of the RICO Class

**COUNT I**
**VIOLATIONS OF RACKETEER INFLUENCED**
**AND CORRUPT ORGANIZATIONS ACT ("RICO"),**
**(18 U.S.C. § 1962(C), (D))**

120.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

121. Plaintiffs bring this Count individually and on behalf of the RICO Class against Defendants Bosch, GM, Ford, FCA, and VM Motori (collectively, "RICO Defendants").

122. The RICO Defendants are all "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

123. Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct, or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Plaintiffs, both individually and as representatives of the RICO Class respectfully acknowledge that, in accordance with the holding in *Sedima, S.P.R.L. v. Imrex Co., Inc*., 473 U.S. 479 (1985), a violation under this statute requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *See id*. at 496.

124. In addition, Section 1962(d) makes it unlawful for "any person to conspire to violate[]" the provisions set forth in the preceding statutory subsection—i.e., subsection (c) (as cited and referenced in the previous paragraph, supra).

125. The rule of RICO and multiple conspiracies is as follows: "(1) a pattern of agreements that absent RICO would constitute multiple conspiracies may be joined under a single RICO conspiracy count if the defendants have agreed to commit a substantive RICO offense; and (2) such an agreement to violate RICO may, as in the case of a traditional 'chain' or 'wheel' conspiracy, be established on circumstantial evidence, i.e., evidence that the nature of the conspiracy is such that each defendant must necessarily have known that others were also conspiring to violate RICO." *United States v. Sutherland*, 656 F.2d 1181, 1194 (5th Cir.1981), *cert. denied*, 455 U.S. 949 (1982)).

126. For years now, the RICO Defendants, along with other entities and individuals, have created and/or participated in the affairs of an illegal enterprise (hereinafter referred to as "Fuel Pump Fraud Enterprise"), the direct purpose of which has been to deceive consumers into believing the Class Vehicles were reliable, durable, and had the fuel efficiency and power expected of a diesel vehicle. As explained in greater detail below, the RICO Defendants' acts in furtherance of the Enterprise violate Section(s) 1962(c) and/or (d).

### 1. Conduct Demonstrating "Fuel Pump Fraud Enterprise"

127. The RICO Defendants intentionally concealed and suppressed material facts concerning the durability and performance of the Bosch CP4 fuel pump and facts concerning the durability and performance of the Class Vehicles, which were misrepresented in order to defraud and mislead the Plaintiffs and other RICO Class Members about the value, performance, and quality of the Class Vehicles.

128. The RICO Defendants knew, at least by 2002, that their fuel injection systems required heightened lubricity, which was not met by American diesel fuel specifications.

129. The RICO Defendants had specific knowledge, by at least 2005, that their fuel injection systems were incompatible with American diesel fuel specifications.

130. Prior to the design, manufacture, and sale of the Class Vehicles, the RICO Defendants knew that Bosch's CP4 pumps were expected to quickly fail in the Class Vehicles and that such failure would result in contamination of the fuel system components and require repair and replacement of those components, repairs or replacements that the Vehicle Manufacturer Defendants would refuse to cover under their warranties.

131. The foregoing omitted facts and representations were material because they directly impacted the value of the Class Vehicles purchased or leased by Plaintiffs and other RICO Class

Members.  The omitted facts were also material because they directly impacted Plaintiffs' and the RICO Class Members' decisions regarding whether to purchase a Class Vehicle, and induced, as intended, Plaintiffs and other RICO Class Members to purchase a Class Vehicle.

132.  Despite this knowledge, the RICO Defendants promoted and marketed the Class Vehicles, touting the increased durability and performance of the Class Vehicles.

133.  Due to the RICO Defendants' specific and superior knowledge that the Bosch CP4 Pumps in the Class Vehicles will fail, and their false representations regarding the increased durability of the Class Vehicles, the RICO Defendants had a duty to disclose to RICO Class Members that: (1) Class Vehicles were incompatible with the use of U.S. fuel; (2) the Bosch CP4 pumps will fail in Class Vehicles; (3) Class Vehicles do not have increased durability over other diesel vehicles; (4) failure of the Bosch CP4 Pumps will cause damage to Class Vehicle engines; and (5) the RICO Class Members would be required to bear the cost of the damage to their vehicles.

134.  The RICO Defendants knew that Plaintiffs and other RICO Class Members reasonably relied upon Defendants' false representations and omissions.  Plaintiffs and other RICO Class Members had no way of knowing that Defendants' representations and omissions were false and misleading, that the Class Vehicles were incompatible with the fuel RICO Defendants knew would be used to operate the Class Vehicles, that the normal and intended use of the Class Vehicles will cause the Bosch CP4 Pumps to fail, or that RICO Defendants would refuse to repair, replace or compensate Plaintiffs and other RICO Class Members for the failure of the Bosch CP4 Pumps and the known consequences of that failure to the Class Vehicle engines.

135.  Plaintiffs and other RICO Class Members could not have known that the Class Vehicles, which were touted by the RICO Defendants for their durability and performance, will fail when used as intended by the RICO Defendants to be used.

136.    RICO Defendants knew that Plaintiffs and other RICO Class Members could not have known that the Class Vehicles will fail when used as intended by Defendants.

137.    The RICO Defendants falsely represented the durability of the Class Vehicles and omitted materials facts regarding the lack of durability of the Class Vehicles, the incompatibility of the Class Vehicles with the fuel intended by the RICO Defendants to be used in the Class Vehicles, and the consequences of that incompatibility, for the purpose of inducing Plaintiffs and other RICO Class Members to purchase Class Vehicles, all with the aim of increasing the RICO Defendants' revenue and profits.

138.    The RICO Defendants' devious scheme to design, market, and sell Class Vehicles with defective Bosch CP4 fuel pumps, knowing that U.S. diesel fuel was certain to be used in the Class Vehicles and the consequence of using U.S. diesel fuel in those vehicles, then concealing their fraudulent scheme from the public and consumers over numerous model years, reveals a corporate culture that emphasized sales and profits over integrity and an intent to deceive Plaintiffs, other RICO Class Members, and the American public regarding the durability and performance of the Class Vehicles and their fuel delivery systems.

139.    The RICO Defendants had a duty to disclose the incompatibility of Class Vehicles with U.S. diesel fuel, including the consequences of that incompatibility, to Plaintiffs and RICO Class Members.  That includes both Bosch and VM Motori, who had a duty to disclose the scheme, given their knowledge of, and complicity in, the design and customization of the CP4 fuel pumps, fuel delivery systems and/or engines for the Class Vehicles.

140.    Had Plaintiffs and other RICO Class Members known that the Class Vehicles did not have increased durability, performance, and reliability over other vehicles, that the Class Vehicles were incompatible with the fuel intended by Plaintiffs, or that Class Vehicles will fail

when used as intended, Plaintiffs and other RICO Class Members would not have purchased a Class Vehicle, or would have paid substantially less for their Class Vehicle based on RICO Defendants' false representations and omissions. In the case of Plaintiffs and other RICO Class Members whose vehicles experienced CP4 pump failure, these Plaintiffs and other RICO Class Members would have taken affirmative steps to mediate the impact of or prevent failure.

141. Because of the RICO Defendants' false representations and omissions, Plaintiffs and other RICO Class Members have sustained damages. Plaintiffs and other RICO Class Members own vehicles that are diminished in value as a result of the RICO Defendants' concealment of the true nature and quality of the Bosch CP4 Pump and the Class Vehicles.

142. The RICO Defendants' failure to disclose the incompatibility of the Class Vehicles with U.S. diesel fuel was intended to cause, and did cause, Plaintiffs and other RICO Class Members to operate Class Vehicles with U.S. fuel. As a result, certain Plaintiffs and other RICO Class Members have been damaged by the failure of the Bosch CP4 Pumps and the resulting failure of Class Vehicle engines, resulting in damages to RICO Class Members and Plaintiffs including but not limited to the cost of repair or replacement of the CP4 fuel pump, the cost of damage caused to the Class Vehicles by the failure of the CP4 fuel pump, loss of use of the Class Vehicles, loss of earnings, and other damages.

143. Accordingly, the RICO Defendants are liable to Plaintiffs and other RICO Class Members for up to three times their damages, as well as compensation for attorneys' fees, and any other declaratory/injunctive relief deemed appropriate.

144. The RICO Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and other RICO Class Members' rights and the representations made by the RICO Defendants to them were made in

order to enrich the RICO Defendants. The RICO Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

145. In accordance with the foregoing paragraphs as set forth under this enumerated cause, the RICO Defendants are hereby alleged to have engaged in an ongoing conspiracy involving years of patterned illegal activity. The RICO Defendants' conduct in designing, and/or manufacturing, and/or marketing, and/or sale(s) of Class Vehicles to Plaintiffs and other RICO Class members constitutes an Enterprise, which is subject to civil penalties.

146. Disturbingly, the RICO Defendants' Enterprise was made in furtherance of mutual enrichment, all at the injurious expense of well-intentioned and trusting American consumers (including the RICO Class). Notably, RICO Defendants' *primary reason* for this undertaking—though accompanied by predicate offenses including, but not limited to, mail fraud and wire fraud (*see* part 2 of this cause, *infra*)—is far less complex than the intricately cast web(s) of relied-upon deception comprising their *modus operandi*.

147. As an Enterprise, RICO Defendants' years-long pattern(s) of such illegal acts, all of which were perpetrated in furtherance of long-contemplated (and subsequently realizable) mutual benefit, illustrate a tragic, yet all-too-familiar, set of criteria in the world of commercial ambition: to bolster revenue, augment profits, and collectively increase an overall share of the American diesel vehicle market, even if it means and/or meant profiting from defective Class Vehicles, and, in turn, causing the RICO Class Members to suffer significant economic injuries.

148. Moreover, the RICO Defendants' collective and wrongful sense of entitlement to inflated financial gains drove them far beyond the realm of law-abiding, "laissez faire" competition, and into the lair of illegal Enterprise.

**2. Predicate Acts Demonstrating "Pattern of Racketeering Activity"**

149.    To carry out, or attempt to carry out, the scheme to defraud, the RICO Defendants conducted or participated in the conduct of the affairs of the Fuel Pump Fraud Enterprise through a pattern of racketeering activity that employed the use of mail and wire facilities, in violation of 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud).

150.    Specifically, the RICO Defendants participated in the scheme to defraud by using mail, telephone, and/or the Internet to transmit writings travelling in interstate and/or foreign commerce. The RICO Defendants' use of the mail and wires include but are not limited to the transmission, delivery, or shipment of the following by the RICO Defendants and/or third parties that were foreseeably caused to be sent as a result of Defendants' illegal scheme:

a)  The Class Vehicles themselves;

b)  Bosch CP4 fuel pumps;

c)  Essential hardware for the Class Vehicles' diesel engines;

d)  Falsified reports and/or statements;

e)  False or misleading postal communications intended to lull consumers from discovering the Bosch CP4 fuel pump's incompatibility with American diesel fuel;

f)  Sales and marketing materials, including advertising, websites, product packaging, brochures, and labeling, which misrepresented and concealed the true nature of the Class Vehicles;

g)  Documents intended to facilitate the manufacture and sale of the Class Vehicles, including bills of lading, invoices, shipping records, reports and correspondence;

h) Documents to process and receive payment for the Class Vehicles by unsuspecting franchise dealers, including invoices and receipts;

i) Payments to Bosch and/or VM Motori;

j) Deposits of proceeds; and

k) Other documents and things, including electronic communications.

151. The RICO Defendants utilized the interstate and international mail and wires for the purpose of obtaining money or property by means of the omissions, false pretense, and misrepresentations described therein.

152. The RICO Defendants also used the Internet and other electronic facilities to carry out the scheme and conceal the ongoing fraudulent activities. Specifically, the RICO Defendants made misrepresentations about the Class Vehicles on their websites, YouTube, and through internet, television, radio, and print ads, all of which were intended to mislead regulators and the public about the quality, performance, and value of Class Vehicles.

153. The RICO Defendants also communicated by U.S. Mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships, and other third-party entities in furtherance of the scheme.

154. The mail and wire transmissions described herein were made in furtherance of the RICO Defendants' scheme and common course of conduct to deceive regulators and consumers and lure consumers into purchasing the Class Vehicles, which the RICO Defendants knew or recklessly disregarded contained CP4 fuel pumps that were not compatible with U.S. diesel fuel, despite their advertising campaigns that the Class Vehicles were more durable, reliable, powerful, and fuel efficient than they actually were.

155.    Many of the precise dates of the fraudulent uses of U.S. Mail and interstate wire facilities have been deliberately hidden and cannot be alleged without access to the RICO Defendants' books and records. However, Plaintiffs have described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

156.    The RICO Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), the RICO Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with the RICO Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for the RICO Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

157.    The RICO Defendants aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

158.    To achieve their common goals, the RICO Defendants hid from the general public the unlawfulness and inferior quality, performance, and value of the Class Vehicles, obfuscating the true nature of the Bosch CP4 fuel pump defect even after the EMA and injured consumers (including Plaintiffs and other RICO Class members) raised concerns.  The RICO Defendants also perpetuated a common desire and scheme to fraudulently promote engines containing the CP4 fuel pump as superior.

159.   GM, Ford, and FCA are all member companies in the EMA.  Through their participation in this organization, and in conjunction with VM Motori, the RICO Defendants knew of the problems associated with the CP4 fuel pump, but nevertheless conspired to fraudulently promote the Bosch CP4 Pump, deliberately skirt responsibility for the problems associated with the pump, and shift the blame of fuel pump failures to American consumers.

160.   The RICO Defendants suppressed and/or ignored warnings from third parties, whistleblowers, and/or others about the lubricative incompatibility of the Bosch CP4 fuel pump with U.S. diesel fuel.

161.   The RICO Defendants and each member of the conspiracy, with knowledge and intent, have agreed to the overall objectives of the conspiracy and participated in the common course of conduct to commit acts of fraud and indecency in designing, manufacturing, distributing, marketing, testing, and/or selling the Class Vehicles (and the Bosch CP4 fuel pumps contained therein).

162.   Indeed, for the conspiracy to succeed, each of the RICO Defendants and their co-conspirators had to agree to implement and use the similar devices and fraudulent tactics—specifically, complete secrecy about the Bosch CP4 fuel pumps present in the Class Vehicles.

163.   The RICO Defendants knew and intended that Plaintiffs and other RICO Class Members, would rely on the material misrepresentations and omissions made by them about the Class Vehicles.  The RICO Defendants knew and intended that Plaintiffs and the RICO Class would incur costs and damages as a result.  As fully alleged herein, Plaintiffs and other RICO Class Members relied upon the RICO Defendants' representations and omissions that were made or caused to be made by them. Plaintiffs' and other RICO Class Members' reliance is made obvious by the fact that they purchased hundreds of thousands of vehicles that never should have

been introduced into the U.S. stream of commerce and whose worth is far less than was paid. Without Plaintiffs' and the other RICO Class Members' reliance on the RICO Defendants' misrepresentations and material omissions, the Fuel Pump Fraud Enterprise would not have reaped unlawful profits.

164.    The RICO Defendants' conduct in furtherance of this scheme was intentional. Plaintiffs and the RICO Class Members were harmed as a result of the RICO Defendants' intentional conduct. Plaintiffs and the RICO Class Members relied on the RICO Defendants' material misrepresentations and omissions.

165.    As described herein, the RICO Defendants engaged in a pattern of related and continuous predicate acts for many years.  The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of defrauding Plaintiffs and other RICO Class Members and obtaining significant monies and revenues from them and through them while providing Class Vehicles worth significantly less than the invoice price paid.  The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events—rather, they were patterned and spanned years, and continue at the present time.

166.    The predicate acts all had the purpose of generating significant revenue and profits for the RICO Defendants at the expense of Plaintiffs and the RICO Class.  The predicate acts were committed or caused to be committed by the RICO Defendants through their participation in the Fuel Pump Fraud Enterprise and in furtherance of its fraudulent scheme, and were interrelated in that they involved obtaining Plaintiffs' and RICO Class members' funds, artificially inflating the brand and dealership goodwill values, and avoiding the expenses associated with remediating the Class Vehicles.

167.     During the design, manufacture, testing, marketing, and sale of the Class Vehicles, the RICO Defendants shared technical, marketing, and financial information that plainly revealed the Bosch CP4 fuel pumps located in the Class Vehicles as the ineffective, illegal, and fraudulently promoted component parts they were (*and are*).  Nevertheless, the RICO Defendants shared and disseminated information that deliberately misrepresented the Bosch CP4 pump and fuel system in Class Vehicles.

168.     In accordance with the foregoing paragraphs, the RICO Defendants are hereby alleged to have engaged in an ongoing illegal conspiracy involving years of patterned illegal activity.  The RICO Defendants' conduct in designing, and/or manufacturing, and/or marketing, and/or sale(s) of Class Vehicles to the RICO Class members constitutes an Enterprise, which is subject to civil penalties.  The subject Enterprise wrongfully profited from the Class Vehicles, subjecting the RICO Defendants to civil liability.

169.     By reason and as a result of the conduct of the RICO Defendants, particularly their established pattern of racketeering activity, Plaintiffs and the RICO Class have been injured in multiple ways, including but not limited to: (1) overpayment for Class Vehicles, in that, at the time of purchase, Plaintiffs and the RICO Class believed they were paying for vehicles that met certain durability, power, performance and fuel efficiency standards and obtained vehicles that did not meet these standards and were worth less than what was paid; and (2) the value of the Class Vehicles has diminished, thus reducing their sale and resale value, and has resulted in a loss of property for Plaintiffs and the RICO Class Members.

170.     The RICO Defendants' violations of 18 U.S.C. § 1962(c) and (d) have directly and proximately caused injuries and damages to Plaintiffs and the RICO Class Members.  Plaintiffs and the RICO Class Members are entitled to bring this action for three times their actual damages,

as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**B. Claims Brought on Behalf of the Vehicle Manufacturer Subclasses**

**COUNT I**
**FRAUD BY OMISSION**

171.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

172.     Plaintiffs bring this Count on behalf of the Vehicle Manufacturer Subclasses against all Defendants.  Specifically, Plaintiffs Christopher Bestor, Christopher Lee Perry, Todd Robinson, Joshua Schatzel, Ron Crowley, Rudy Zepeda assert this Count on behalf of the GM Subclass against GM and the Bosch Defendants.  Plaintiffs Darren Barsness, Roger W. Dunagan, Daryle Craig Eagle, John Fisher, Jared Geuder, Blake Gressett, Tanner Griffin, Richard Terrell Haydock, Robert Hearne, Charles Dale Hoyt, Cedric Jones, Jack Landry Mann, Michael Mathews, Shane McCaslin, Jimmy Orozco, Jose Ortiz, Ray Anthony Rodriguez, Sara Rook, Joseph Anthony Stallone, Charley Tanner, David Walker, Aldo Granillo, Michael Jeffcoat assert this Count on behalf of the Ford Subclass against Ford and the Bosch Defendants.  Plaintiff Kevin Berry asserts this Count on behalf of the FCA Subclass against FCA, the Bosch Defendants and VM Motori.

173.     As alleged above, Defendants intentionally concealed and suppressed material facts concerning the durability and performance of the Bosch CP4 Pump, and in the case of the Vehicle Manufacturer Defendants, facts concerning the durability and performance of the Class Vehicles and their engines, in order to defraud and mislead the Class about the true nature of the Class Vehicles.

174.     As alleged above, Defendants knew at least by 2002 that their fuel injection systems required heightened lubricity, which was not met by American diesel fuel specifications.

175. As alleged above, Defendants had specific knowledge by at least 2005 that their fuel injection systems were incompatible with American diesel fuel specifications.

176. As alleged above, prior to the design, manufacture and sale of the Class Vehicles, Defendants knew that the Bosch CP4 Pumps were expected to quickly fail in the Class Vehicles and that such failure would result in contamination of the fuel system components and require repair and replacement of those components, which repairs or replacements Defendants would refuse to cover under their warranties.

177. The foregoing omitted facts and representations were material because they directly impacted the value of the Class Vehicles purchased or leased by Plaintiffs and other Class Members, because those facts directly impacted the decision regarding whether or not Plaintiffs and other Class Members would purchase a Class Vehicle, and because they induced and were intended to induce Plaintiffs and other Class Members to purchase a Class Vehicle.

178. Despite this knowledge, Defendants marketed the Class Vehicles, touting the increased durability and performance of the Class Vehicles.

179. Due to their specific and superior knowledge that the Bosch CP4 Pumps in the Class Vehicles will fail, and due to their false representations regarding the increased durability of the Class vehicles, Defendants had a duty to disclose to Class Members that their vehicles were incompatible with the use of U.S. fuel, that the Bosch CP4 Pumps will fail in Class Vehicles, that Class Vehicles do not have increased durability over other diesel vehicles, that failure of the Bosch CP4 Pumps will cause damage to Class Vehicle engines, and that Class Members would be required to bear the cost of the damage to their vehicles.

180. Defendants knew that Plaintiffs and other Class Members reasonably relied upon Defendants' false representations and omissions. Plaintiffs and other Class Members had no way

of knowing that Defendants' representations and omissions were false and misleading, that the Class Vehicles were incompatible with the fuel Defendants knew would be used to operate the Class Vehicles, that the normal and intended use of the Class Vehicles will cause the Bosch CP4 Pumps to fail, or that Defendants would refuse to repair, replace or compensate Plaintiffs and other Class Members for the failure of the Bosch CP4 Pumps and the known consequences of that failure to the Class Vehicle engines.

181.    Plaintiffs and other Class Members could not have known that the Class Vehicles, which were touted by Defendants for their durability and performance, will fail when used as intended by the Defendants to be used.

182.    Defendants knew that Plaintiffs and other Class Members could not have known that Class Vehicles will fail when used as intended by Defendants.

183.    Defendants falsely represented the durability of the Class Vehicles and omitted materials facts regarding the lack of durability of the Class Vehicles, the incompatibility of the Class Vehicles with the fuel intended by Defendants to be used in the Class Vehicles, and the consequences of that incompatibility, for the purpose of inducing Plaintiffs and other Class Members to purchase Class Vehicles, and to increase their revenue and profits.

184.    Defendants' devious scheme to design, market and sell Class Vehicles with defective CP4 pumps, knowing that U.S. fuel that was certain to be used in the Class Vehicles and the consequence of using U.S. diesel fuel in those vehicles, then concealing their fraudulent scheme from the public and consumers over numerous model years, reveals a corporate culture that emphasized sales and profits over integrity and an intent to deceive Plaintiffs, other Class Members and the American public regarding the durability and performance of the Class Vehicles and their fuel delivery systems.

185. Defendants had a duty to disclose the incompatibility of Class Vehicles with U.S. diesel fuel, including the consequences of that incompatibility, to Plaintiffs and Class members. That includes both Bosch and VM Motori, who had a duty to disclose the scheme, given their knowledge of and complicity in, the design and customization of the CP4 fuel pumps, fuel delivery systems and/or engines for the Class Vehicles.

186. Had Plaintiffs and other Class Members known that the Class Vehicles did not have increased durability over other diesel vehicles, that the Class Vehicles were incompatible with the fuel intended by Plaintiffs, other Class Members and Defendants to be used in the Class Vehicles (without which the Class Vehicles would serve no purpose to Plaintiffs and other Class Members), or that Class Vehicles will fail when used as intended, Plaintiffs and other Class Members would not have purchased a Class Vehicle, or would have paid substantially less for their Class Vehicle than paid based on Defendants' false representations and omissions, or, in the case of Plaintiffs and other Class Members whose vehicles experienced CP4 pump failure, would have taken affirmative steps to mediate the impact of or prevent failure.

187. Because of Defendants' false representations and omissions, Plaintiffs and other Class Members have sustained damages because they own vehicles that are diminished in value as a result of Defendants' concealment of the true nature and quality of the Bosch CP4 Pump and the Class Vehicles.

188. Defendants' failure to disclose the incompatibility of the Class Vehicles with U.S. fuel was intended to cause and did cause Plaintiffs and other Class Members to operate Class Vehicles with U.S. fuel; and, as a result, certain Plaintiffs and other Class Members have been damaged by the failure of the Bosch CP4 Pumps and the resulting failure of Class Vehicle engines, resulting in damages to Class Members and Plaintiffs including but not limited to the cost of repair

or replacement of the CP4 fuel pump, the cost of damage caused to the Class Vehicles by the failure of the CP4 fuel pump, loss of use of the Class Vehicles, loss of earnings, and other damages.

189. Accordingly, Defendants are liable to Plaintiffs and other Class Members for damages in an amount to be proved at trial.

190. Defendants' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and other Class Members' rights and the representations made by Defendants to them were made in order to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT II**
**VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT**
**(Tex. Bus. & Com. Code §§ 17.41, _et seq._)**

191. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

192. Plaintiffs intend to assert this Count on behalf of the Vehicle Manufacturer Subclasses against the Vehicle Manufacturer Defendants. Specifically, Plaintiffs Christopher Bestor, Christopher Lee Perry, Todd Robinson, Joshua Schatzel, Ron Crowley, Rudy Zepeda intend to assert this Count on behalf of the GM Subclass against GM. Plaintiffs Darren Barsness, Roger W. Dunagan, Daryle Craig Eagle, John Fisher, Jared Geuder, Blake Gressett, Tanner Griffin, Richard Terrell Haydock, Robert Hearne, Charles Dale Hoyt, Cedric Jones, Jack Landry Mann, Michael Mathews, Shane McCaslin, Jimmy Orozco, Jose Ortiz, Ray Anthony Rodriguez, Sara Rook, Joseph Anthony Stallone, Charley Tanner, David Walker, Aldo Granillo, Michael Jeffcoat intend to assert this Count on behalf of the Ford Subclass against Ford. Plaintiff Kevin Berry intends to assert this Count on behalf of the FCA Subclass against FCA and VM Motori.

193. Plaintiffs intend to assert a claim under the Texas Deceptive Trade Practices Act, which makes it unlawful to commit "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Tex. Bus. & Com. Code § 17.46. Plaintiffs will make a demand in satisfaction of the Act and may amend this Complaint to Assert claims under the Act once the required 60 days have elapsed. This paragraph is included for purposes of notice only and is not intended to actually assert a claim under the Texas Deceptive Trade Practices Act.

## COUNT III
## UNJUST ENRICHMENT
## AGAINST THE VEHICLE MANUFACTURER DEFENDANTS

194. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

195. Plaintiffs bring this Count on behalf of the Vehicle Manufacturer Subclasses against the Vehicle Manufacturer Defendants. Specifically, Plaintiffs Christopher Bestor, Christopher Lee Perry, Todd Robinson, Joshua Schatzel, Ron Crowley, Rudy Zepeda assert this Count on behalf of the GM Subclass against GM. Plaintiffs Darren Barsness, Roger W. Dunagan, Daryle Craig Eagle, John Fisher, Jared Geuder, Blake Gressett, Tanner Griffin, Richard Terrell Haydock, Robert Hearne, Charles Dale Hoyt, Cedric Jones, Jack Landry Mann, Michael Mathews, Shane McCaslin, Jimmy Orozco, Jose Ortiz, Ray Anthony Rodriguez, Sara Rook, Joseph Anthony Stallone, Charley Tanner, David Walker, Aldo Granillo, Michael Jeffcoat assert this Count on behalf of the Ford Subclass against Ford. Plaintiff Kevin Berry asserts this Count on behalf of the FCA Subclass against FCA and VM Motori.

196. As a result of their wrongful and fraudulent acts and omissions, as set forth herein, pertaining to the defects in the Bosch CP4 Pump and the Class Vehicles and the concealment thereof, the Vehicle Manufacturer Defendants charged a higher price for the Class Vehicles than

the Vehicles' true value and Defendants, therefore, obtained monies that rightfully belong to Plaintiffs and other Class Members.

197.    Defendants have benefitted from selling and leasing at an unjust profit defective Class Vehicles whose value was artificially inflated by the Vehicle Manufacturer Defendants' concealment of the defective nature of the CP4 fuel pump and of the Class Vehicles.

198.    The Vehicle Manufacturer Defendants enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class Members, who paid a higher price for their vehicles that actually had lower values.

199.    The Vehicle Manufacturer Defendants have received and retained unjust benefits from the Plaintiffs and other Class Members, and inequity has resulted.

200.    It would be inequitable and unconscionable for the Vehicle Manufacturer Defendants to retain these wrongfully obtained benefits.

201.    Because the Vehicle Manufacturer Defendants concealed their fraud and deception, Plaintiffs and other Class Members were not aware of the true facts concerning the Class Vehicles and did not benefit from the Vehicle Manufacturer Defendants' misconduct.

202.    The Vehicle Manufacturer Defendants knowingly accepted the unjust benefits of their fraudulent conduct.

203.    As a result of the Vehicle Manufacturer Defendants' misconduct, the amount of their unjust enrichment should be disgorged and returned to Plaintiffs and other Class Members, in an amount to be proven at trial.

204.    Plaintiffs and other Class Members, therefore, seek an order establishing the Vehicle Manufacturer Defendants as constructive trustees of the profits unjustly obtained, plus interest.

## COUNT IV
## UNJUST ENRICHMENT
## AGAINST THE BOSCH DEFENDANTS

205.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

206.    Plaintiffs bring this Count on behalf of their respective Vehicle Manufacturer Subclasses against the Bosch Defendants.

207.    As a result of their wrongful and fraudulent acts and omissions, as set forth herein, pertaining to the defects in the Bosch CP4 Pump and the Class Vehicles and the concealment thereof, the Bosch Defendants charged a higher price for the Bosch CP4 Pump than the true value of the pump, which increased and improper price and cost was passed to Plaintiffs and other Class Members at the point of sale. The Bosch Defendants, therefore, obtained monies that rightfully belong to Plaintiffs and other Class Members.

208.    The Bosch Defendants have benefitted from selling CP4 pumps at an unjust profit, which CP4 pump value was artificially inflated by Bosch Defendants' concealment of the defective nature of the CP4 fuel pump when integrated as intended by Bosch in the Class Vehicles.

209.    The Bosch Defendants enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class Members, who paid a higher price for their vehicles, which actually had lower values.

210.    The Bosch Defendants have received and retained unjust benefits from the Plaintiffs and other Class Members, and inequity has resulted.

211.    It would be inequitable and unconscionable for the Bosch Defendants to retain these wrongfully obtained benefits.

212.    Because the Bosch Defendants concealed their fraud and deception, Plaintiffs and other Class Members were not aware of the true facts concerning the Bosch CP4 Pump as integrated as intended by Bosch into the Class Vehicles, and Plaintiffs and other Class Members did not benefit from the Bosch Defendants' misconduct.

213.    The Bosch Defendants knowingly accepted the unjust benefits of their fraudulent conduct.

214.    As a result of the Bosch Defendants' misconduct, the amount of their unjust enrichment should be disgorged and returned to Plaintiffs and other Class Members, in an amount to be proven at trial.

215.    Plaintiffs and other Class Members, therefore, seek an order establishing the Bosch Defendants as constructive trustees of the profits unjustly obtained, plus interest.

**COUNT V**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Tex. Bus. & Com. Code §§ 2.314 and 2A.212)**

216.    Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

217.    Plaintiffs bring this Count on behalf of the Vehicle Manufacturer Subclasses against the Vehicle Manufacturer Defendants.  Specifically, Plaintiffs Christopher Bestor, Christopher Lee Perry, Todd Robinson, Joshua Schatzel, Ron Crowley, Rudy Zepeda assert this Count on behalf of the GM Subclass against GM. Plaintiffs Darren Barsness, Roger W. Dunagan, Daryle Craig Eagle, John Fisher, Jared Geuder, Blake Gressett, Tanner Griffin, Richard Terrell Haydock, Robert Hearne, Charles Dale Hoyt, Cedric Jones, Jack Landry Mann, Michael Mathews, Shane McCaslin, Jimmy Orozco, Jose Ortiz, Ray Anthony Rodriguez, Sara Rook, Joseph Anthony Stallone, Charley Tanner, David Walker, Aldo Granillo, Michael Jeffcoat assert this Count on behalf of the Ford

Subclass against Ford. Plaintiff Kevin Berry asserts this Count on behalf of the FCA Subclass against FCA.

218. The Vehicle Manufacturer Defendants are and were at all times "merchants" with respect to motor vehicles under Tex. Bus. & Com. Code § 2.104(1) and 2A.103(a)(2), and "sellers" of motor vehicles under § 2.103(a)(4).

219. With respect to leases, the Vehicle Manufacturer Defendants are and were at all relevant times "lessors" of motor vehicles under Tex. Bus. & Com. Code § 2A.103(a)(16).

220. The Class Vehicles are and were at all relevant times "goods" within the meaning if Tex. Bus. & Com. Code. §§ 2.105(a) and 2A.103(a)(16).

221. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which the vehicles are used is implied by law pursuant to Tex. Bus. & Com. Code § § 2.314 and 2A.212.

222. The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are incompatible with the use of American diesel fuel (the fuel intended to be used by the Vehicle Manufacturer Defendants and expected to be used by Plaintiffs and other Class Members) in that use of American diesel fuel (the only fuel reasonably available to Plaintiffs and other Class Members) causes a breakdown of the CP4 fuel pump (a condition that Defendants knew would occur prior their design and sale of the Class Vehicles), resulting in fuel contamination, ultimate and catastrophic failure of the Bosch CP4 Pump, and contamination and failure of other components in the Class Vehicle fuel delivery system.

223. The Vehicle Manufacturer Defendants were provided notice of these issues within a reasonable time of Plaintiffs' knowledge of the non-conforming or defective nature of the Class

Vehicles, by letters from Plaintiffs' counsel, on behalf of Plaintiffs, to the Vehicle Manufacturer Defendants, complaints by Plaintiffs or Class Members to Defendants either orally or in writing, complaints to dealerships, intermediate sellers, or repair facilities either orally or in writing, presentation of the vehicles for repair to dealerships or to intermediate sellers or repair facilities, and by the allegations contained in this Complaint.

224. As a direct and proximate result of the Vehicle Manufacturer Defendants' breach of the implied warranty of merchantability, Plaintiffs and other Class Members have been damaged in an amount to be proven at trial.

## COUNT VI
## BREACH OF EXPRESS WARRANTY
## (Tex. Bus. & Com. Code §§ 2.313 and 2A.210)

225. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

226. Plaintiffs bring this Count on behalf of the Vehicle Manufacturer Subclasses against the Vehicle Manufacturer Defendants. Specifically, Plaintiffs Christopher Bestor, Christopher Lee Perry, Todd Robinson, Joshua Schatzel, Ron Crowley, Rudy Zepeda assert this Count on behalf of the GM Subclass against GM. Plaintiffs Darren Barsness, Roger W. Dunagan, Daryle Craig Eagle, John Fisher, Jared Geuder, Blake Gressett, Tanner Griffin, Richard Terrell Haydock, Robert Hearne, Charles Dale Hoyt, Cedric Jones, Jack Landry Mann, Michael Mathews, Shane McCaslin, Jimmy Orozco, Jose Ortiz, Ray Anthony Rodriguez, Sara Rook, Joseph Anthony Stallone, Charley Tanner, David Walker, Aldo Granillo, Michael Jeffcoat assert this Count on behalf of the Ford Subclass against Ford. Plaintiff Kevin Berry asserts this Count on behalf of the FCA Subclass against FCA.

227. The Vehicle Manufacturer Defendants are and were at all relevant times "merchants" with respect to motor vehicles under Tex. Bus. & Com. Code. § 2.104(1) and 2A.103(a)(2), and "sellers" of motor vehicles under § 2.103(a)(4).

228. With respect to leases, the Vehicle Manufacturer Defendants are and were at all relevant times "lessors of motor vehicles under Tex. Bus. & Com. Code § 2A.103(a)(16).

229. The Class Vehicles are and were at all relevant times "goods" within the meaning of Tex. Bus. & Com. Code § § 2.105(a) and 2A.103(a)(8).

230. In connection with the purchase or lease of each or one of their new vehicles, and as described more fully above, the Vehicle Manufacturer Defendants provided an express written warranty and provided other express warranties to Plaintiffs and other Class Members.

231. The Vehicle Manufacturer Defendants' warranties formed a basis of the bargain that was reached when Plaintiffs and other Class Members purchased or leased their Class Vehicles, which were, unknown to Plaintiffs and other Class Members, equipped with defective CP4 fuel injection pumps.

232. Plaintiffs and other Class Members experienced defects within the warranty period by way of fuel contamination and/or failure of the Bosch CP4 Pump and/or damage to the engine and fuel delivery system.

233. Despite the existence of warranties, the Vehicle Manufacturer Defendants failed to inform Plaintiffs and other Class Members that the use of American diesel fuel in Class Vehicles (as intended and directed by the Vehicle Manufacturer Defendants) would cause a material breakdown of the Bosch CP4 Pump, resulting in fuel contamination, complete failure of the Bosch CP4 Pump and catastrophic failure of other fuel system components in the Class Vehicles.

234.    The Vehicle Manufacturer Defendants failed to fix the defective and non-conforming condition of, and failed to fix the resulting damage to the Class Vehicles, free of charge.

235.    The Vehicle Manufacturer Defendants breached the express warranty promising to repair and correct a manufacturing defect or materials, workmanship or parts they should have provided free of charge.  The Vehicle Manufacturer Defendants have not repaired and are unable to repair the Class Vehicles' materials and workmanship defects.

236.    Affording the Vehicle Manufacturer Defendants a reasonable opportunity to cure their breach of express warranties would be unnecessary and futile here. The Vehicle Manufacturers promised increased durability, performance and fuel efficiency in the Class Vehicles based on the advancement of the Bosch CP4 Pump.  The superiority claimed by the Vehicle Manufacturer Defendants of the Class Vehicles cannot be maintained by any repair or replacement by Defendants': (a) replacement of the defective CP4 pump with the older, less fuel-efficient CP3 pump; or (b) installation of a lift kit—as these remedies would not make Plaintiffs and other Class Members whole because that remedy would result in reduced fuel efficiency. There is currently no known repair, replacement or remedy that would correct the defect without impairing some other aspect of the Class Vehicles or requiring increased maintenance, cost and time on the part of Plaintiffs and other Class Members.

237.    The express warranties fail in their essential purpose because the Vehicle Manufacturer Defendants cannot correct the non-conforming and defective nature of the CP4 fuel injection pump within a reasonable time, and in fact, cannot correct, repair or replace the CP4 fuel injection pump without creating a new defective condition in the Class Vehicles, namely decreased fuel efficiency.

238.    The warranties promising to repair and/or correct a manufacturing defect fail in their essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class Members whole and because the Vehicle Manufacturer Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

239.    Accordingly, recovery by Plaintiff and the other Class Members is not restricted to the warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Class Members, seek all remedies as allowed by law.

240.    In addition, at the time the Vehicle Manufacturer Defendants warranted and sold or leased the Class Vehicles, they knew the Class Vehicles were inherently defective and did not conform to their warranties; further, the Vehicle Manufacturer Defendants wrongfully and fraudulently concealed material facts regarding Class Vehicles. Plaintiffs and other Class Members were therefore induced to purchase or lease the Class Vehicles under false and/or fraudulent pretenses.

241.    Moreover, many of the damages flowing from the Class Vehicles cannot be resolved through the limited remedy of replacements or adjustments, as many incidental and consequential damages have already been suffered because of the Vehicle Manufacturer Defendants' fraudulent conduct and because of their failure to provide a remedy within a reasonable time, and any limitation on Plaintiffs' and the other Class Members' remedies would be insufficient to make Plaintiffs and other Class Members whole.

242.    Finally, because of the Vehicle Manufacturer Defendants' breach of warranty as set forth herein, Plaintiffs and other Class Members assert, as an additional or alternative remedy, the revocation of acceptance of the goods and the return to Plaintiffs and the other Class Members

of the Purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages as allowed.

243.    The Vehicle Manufacturer Defendants were provided notice of these issues within a reasonable time of Plaintiffs' knowledge of the non-conforming or defective nature of the Class Vehicles, by letters from Plaintiffs' counsel, on behalf of Plaintiffs, to the Vehicle Manufacturer Defendants, complaints by Plaintiffs or Class Members to Defendants either orally or in writing, complaints to dealerships, intermediate sellers, or repair facilities either orally or in writing, presentation of the vehicles for repair to dealerships, intermediate sellers or repair facilities, and by the allegations contained in this Complaint.

244.    As a direct and proximate result of the Vehicle Manufacturer Defendants' breach of express warranties, Plaintiffs and other Class Members have been damaged in an amount to be determined at trial.

## COUNT VII
## VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
## (15 U.S.C. § 2301, *et seq.*)

245.    Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

246.    Plaintiffs bring this Count on behalf of the Vehicle Manufacturer Defendant Subclasses against the Vehicle Manufacturer Defendants. Specifically, Plaintiffs Christopher Bestor, Christopher Lee Perry, Todd Robinson, Joshua Schatzel, Ron Crowley, Rudy Zepeda assert this Count on behalf of the GM Subclass against GM. Plaintiffs Darren Barsness, Roger W. Dunagan, Daryle Craig Eagle, John Fisher, Jared Geuder, Blake Gressett, Tanner Griffin, Richard Terrell Haydock, Robert Hearne, Charles Dale Hoyt, Cedric Jones, Jack Landry Mann, Michael Mathews, Shane McCaslin, Jimmy Orozco, Jose Ortiz, Ray Anthony Rodriguez, Sara Rook,

Joseph Anthony Stallone, Charley Tanner, David Walker, Aldo Granillo, Michael Jeffcoat assert this Count on behalf of the Ford Subclass against Ford. Plaintiff Kevin Berry asserts this Count on behalf of the FCA Subclass against FCA.

247. This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)—(d).

248. The Class Vehicles manufactured and sold by the Vehicle Manufacturer Defendants are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

249. Plaintiffs and other Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). They are consumers because they are persons entitled under applicable state law to enforce against the warrantors the obligations of their implied warranties.

250. The Vehicle Manufacturer Defendants each were a "supplier" and "warrantor" within the meaning of the Magnuson- Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

251. 15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

252. The Vehicle Manufacturer Defendants provided Plaintiffs and other Class Members with an implied warranty of merchantability in connection with the purchase or lease of the Class Vehicles, that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, the Vehicle Manufacturer Defendants warranted that the Class Vehicles were fit for their ordinary purpose as motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

253.    The Vehicle Manufacturer Defendants breached their implied warranties, as described in more detail above, and are therefore liable to Plaintiffs and other Class Members pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Class Vehicles were equipped with defective CP4 fuel pumps that are incompatible with American diesel fuel (which fuel is intended by the Vehicle Manufacturer Defendants to be used in the Class Vehicles, expected by Plaintiffs and other Class Members to be used in Class Vehicles and is the only fuel reasonable available in order for Plaintiffs and other Class Members to use the Class Vehicles for their intended or ordinary purpose), which when used with the intended American diesel fuel break down, resulting in fuel contamination, complete and catastrophic failure of the Bosch CP4 Pump, and in contamination and catastrophic and costly failure of the Class Vehicles' fuel delivery systems.

254.    In their capacity as a warrantor, the Vehicle Manufacturer Defendants had knowledge of the inherent defects in the Class Vehicles. Any effort by the Vehicle Manufacturer Defendants to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Class Vehicles is null and void.

255.    Any limitations the Vehicle Manufacturer Defendants might seek to impose on their warranties are procedurally unconscionable. There was unequal bargaining power between the Vehicle Manufacturer Defendants and Plaintiffs and the other Class Members, as, at the time of purchase and lease, Plaintiffs and the other Class Members had no other options for purchasing warranty coverage other than directly from the Vehicle Manufacturer Defendants.

256.    Any limitations the Vehicle Manufacturer Defendants might seek to impose on their warranties are substantively unconscionable. The Vehicle Manufacturer Defendants knew that the

Class Vehicles were defective and would continue to fail during and after any purported expiration of warranties.

257.    Despite that failure was expected to occur with the intended use of American diesel fuel, the Vehicle Manufacturer Defendants failed to disclose these defects to Plaintiffs and the other Class Members. Thus, any enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

258.    Plaintiffs and each of the other Class Members have had sufficient direct dealings with either the Vehicle Manufacturer Defendants or their agents (dealerships) to establish privity of contract between the Vehicle Manufacturer Defendants, on the one hand, and Plaintiffs and each of the Class Members, on the other hand. Nonetheless, privity is not required here because Plaintiffs and each of the other Class Members are intended third-party beneficiaries of contracts between the Vehicle Manufacturer Defendants and their dealers, and specifically, of the Vehicle Manufacturer Defendants' implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers.

259.    Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give the Vehicle Manufacturer Defendants notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

260.    Nonetheless, the Vehicle Manufacturer Defendants were provided notice of the defective and non-conforming nature of the Class Vehicles as described herein, within a reasonable time of Plaintiffs' knowledge of the non-conforming and defective nature of the Class Vehicles, by letters from Plaintiffs' counsel, on behalf of Plaintiffs, to the Vehicle Manufacturer Defendants,

complaints by Plaintiffs or Class Members to Defendants either orally or in writing, complaints to dealerships, intermediate sellers, or repair facilities either orally or in writing, presentation of the vehicles for repair to dealerships, intermediate sellers or repair facilities, and by the allegations contained in this Complaint.

261. The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of other Class Members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs and the other Class Members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the other Class Members in connection with the commencement and prosecution of this action.

**WHEREFORE**, Plaintiffs, individually and on behalf of members of the Class and Subclasses, respectfully request that the Court enter judgment in their favor and against Defendants as follows:

A. Certification of the proposed RICO Class and the Vehicle Manufacturer Subclasses, including appointment of Plaintiffs' counsel as Class Counsel;

B. An order temporarily and permanently enjoining Defendants from continuing unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C. Injunctive relief in the form of a recall, free replacement or buy-back program;

D. An order establishing the Vehicle Manufacturer Defendants as constructive trustees over profits wrongfully obtained, plus interest;

E.  Costs, restitution, damages, including punitive damages, exemplary damages and treble damages, and disgorgement in an amount to be determined at trial;

F.  An order requiring Defendants to pay both pre and post-judgment interest on any amounts awarded;

G.  An award of costs and attorney's fees; and

H.  Such other or further relief as may be appropriate.

## VIII.  DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

Respectfully submitted this 1st day of October, 2018.

/s/ Robert C. Hilliard

Robert C. Hilliard
Texas State Bar No. 09677700
Federal I.D. No. 5912
Hilliard, Martinez, Gonzales LLP
719 S. Shoreline Blvd.
Corpus Christi, Texas 78401
Phone: (361) 882-1612
Fax: (361) 882-3015
Email: bob@hmglawfirm.com
***ATTORNEY IN CHARGE FOR PLAINTIFF***

**OF COUNSEL:**
Rudy Gonzales, Jr.
Texas State Bar No. 08121700
Federal I.D. No. 1896
Email: rudy@hmglawfirm.com
John B. Martinez
Texas State Bar No. 24010212
Federal I.D. No. 25316
Email: john@hmglawfirm.com
Marion Reilly

Texas State Bar No. 24079195
Federal I.D. No. 1357491
Email: marion@hmglawfirm.com
Bradford P. Klager
State Bar No. 24012969
Federal I.D. No. 24435
Email: brad@hmglawfirm.com

**HILLIARD MARTINEZ GONZALES LLP**
719 S. Shoreline Blvd.
Corpus Christi, Texas 78401
Phone: (361) 882-1612
Fax: (361) 882-3015

-And


T. Michael Morgan, Esq.
FBN: 0062229
E-Mail: mmorgan@forthepeople.com
Secondary Email: plarue@forthepeople.com

MORGAN & MORGAN, P.A.
20 North Orange Ave., Ste. 1600
P.O. Box 4979
Orlando, FL 32801
Tel.: (407) 418-2081
Fax: (407) 245-3392